No. 80,207

JOY HESLER, STACEY FULTON, EVAN FULTON, ARIEL FULTON, and AMANDA FULTON, *Appellants*, v. OSAWATOMIE STATE HOSPITAL, ROBERT HWANG, M.D., NINA TUSH, KATHY WILLIAMS, and HAZEL WILHOITE, *Appellees*.

(971 P.2d 1169)

Opinion filed January 22, 1999.

*Steven W. White*, of White, Allinder & Graham, L.L.C., of Independence, Missouri, argued the cause, and *Mary Beth Clune*, of the same firm, was with him on the brief for appellants Stacey Fulton, Evan Fulton, and Ariel Fulton.

*Aline Pryor*, of Sexton, Shelor, Latimer & Pryor, of Shawnee Mission, was on the brief for appellant Amanda Fulton.

*Robert L. Wehrman*, of Wehrman & Colantuono, L.L.C., of Kansas City, Missouri, and *Joseph R. Colantuono* and *Christopher J. Reedy*, of Wehrman & Colantuono, L.L.C., of Overland Park, were on the brief for appellant Joy Hesler.

*Michael George*, Chief of Litigation, Department of Social and Rehabilitation Services, argued the cause, and *Matt Boddington* and *C. William Ossmann*, of the same agency, were with him on the brief for appellee Osawatomie State Hospital.

*Gabrielle Rhodes*, of Turner and Boisseau, Chartered, of Overland Park, argued the cause, and *Hal D. Meltzer*, of the same firm, was with her on the brief for appellee Robert Hwang, M.D.

*Gregory A. Lee*, of Gehrt & Roberts, Chartered, of Topeka, was on the brief for appellees Nina Tush, R.N., Kathy Williams, R.N., and Hazel Wilhoite, R.N.

The opinion of the court was delivered by

ABBOTT, J.: This is an appeal by the plaintiffs from the trial court's order granting summary judgment in favor of the defendants for damages arising out of an automobile accident. This is a consolidated lawsuit that arises from the death of Arthur Fulton and injuries to Joy Hesler. Ronald Hesler, an adult involuntarily committed patient from the Osawatomie State Hospital who was released on a temporary off-grounds pass, was riding with Joy Hesler, his mother. Ronald Hesler allegedly grabbed the steering wheel of the car, causing it to veer into the path of on-coming traffic.

The plaintiffs are Joy Hesler, mother of Ronald Hesler; Stacey Fulton, widow of Arthur Fulton; Evan Fulton and Ariel Fulton, children of Stacey and Arthur Fulton; and Amanda Fulton, child of Arthur Fulton by a prior marriage.

The defendants are Robert Hwang, M.D.; Osawatomie State Hospital (OSH); and Nina Tush, R.N., Kathy Williams, R.N., and Hazel Wilhoite, R.N. (the Nurses).

Ron had suffered mental problems for some time. He had been hospitalized after attempting to walk to Colorado or California and was found sitting under a tree in Lawrence, Kansas. He had not eaten for some time.

On August 8, 1994, Dr. Justo Cabanas, M.D., of the Rainbow Mental Health Facility (Rainbow), recommended long-term hospitalization for Ron at OSH. Ron had been at Rainbow for 30 days without improvement. Dr. Cabanas wrote that Ron "is rather paranoid with poor insight, judgment and comprehension. He wants to walk to Colorado or California and is unable to comprehend the dangerousness of this, weather, etc." Dr. Cabanas diagnosed Ron as "schizophrenic, paranoid," and stated:

"[Ron] is dangerous to himself and others because of poor judgment. He refuses to follow treatment and refuses to go to [OSH] for continued treatment. Ron has a severe, chronic, mental disorder and is in need of treatment without which he will further decompensate. He is not competent to make reasonable decisions concerning his treatment due to poor thinking and inability to see consequences."

An order of protective custody was entered for Ron. Dr. Basuviah Shanker, an OSH staff psychiatrist, performed an admission assessment on Ron. Dr. Shanker's admission evaluation stated that Ron had been at Rainbow for the last 36 days and that Rainbow had petitioned the court for a determination of mental illness. Dr. Shanker wrote the following description of Ron's mental status: "He is oriented to time. Attention span was poor and concentration only fair."

Dr. Shanker noted that Ron had no criminal history and had no violent behavior in the past on the History of Factors Related to Violence form, which he completed during his assessment. He did note, however, that "impulsivity" was a consideration in assessing Ron's violence potential. After Dr. Shanker's initial assessment, Ron was assigned to Dr. Hwang for evaluation and treatment. Dr. Hwang, a board-certified psychiatrist, was employed by the State of Kansas to evaluate and treat patients confined to OSH. Dr. Hwang diagnosed Ron as a chronic schizophrenic and prescribed psychotropic medications for him in conjunction with his other treatment.

On August 16, 1994, Ron was on the patio, where patients who have patio privileges were allowed to smoke, when he pushed his way off the ward and began running in an attempt to escape from OSH. Hospital staff stopped Ron and returned him to the ward.

Ron was given Haldol, and the staff was advised to monitor him closely.

On August 18, 1994, Dr. Hwang compiled a Master Treatment Plan (the Plan) for Ron. The Plan provided that the reasons for Ron's admission were "[d]eterioration of functioning, not eating, sleeping, or taking medication, confusion, inappropriate laughter, & appearing to respond to internal stimuli." The Plan also stated that "Hazel Wilhoite RN, Kathy Williams RN, Nina Tush RN, & Robert Obermeier RN, assisted by assigned nursing staff will assist patient to identify/discuss thoughts, perceptions, and feelings. Emphasize how schizophrenia affects thoughts, perceptions, and feelings."

On August 21, 1994, OSH staff reported that Ron was pacing and complaining of restlessness. Later that day, Ron dove through a glass window about 3 feet above the ground in the OSH dining hall in an attempt to escape from OSH. Hospital staff secured Ron and returned him to the ward, where he was placed on locked room restriction, requiring observation checks every 15 minutes. Ron sustained cuts, abrasions, and minor contusions due to his jump through the window.

Commencing August 23, 1993, Ron's medication was changed from Haldol to Risperdal. After this change in medication, the OSH staff reported that Ron was compliant with his treatment, interacted socially, and exhibited no impulsive behaviors.

Dr. Hwang stated that an off-grounds pass was a valuable evaluative and therapeutic tool because it provided a psychiatrist with information helpful in assessing a patient's ability to function outside of the hospital setting. Likewise, Dr. Hwang stated that off-grounds passes provided a patient with the opportunity to recognize his ability to function "outside" and to experience and recognize his feelings outside of the hospital setting. These factors would then be considered by Dr. Hwang in planning further treatment and in making recommendations regarding Ron's progress to the court as required pursuant to K.S.A. 59-2919a.

At a routinely scheduled meeting on August 31, 1994, Ron's request for two off-ground passes was considered by the treatment team. Dr. Hwang issued an off-grounds pass authorizing Ron to

leave OSH for 4 hours to have lunch with his parents on September 4, 1994. Ron's request for a pass to walk around downtown unaccompanied on September 3 was also considered, but Dr. Hwang declined to issue a pass. Ron's behavior was appropriate during the September 4 pass with his parents, and his parents expressed their wish to take Ron on future passes from OSH after the successful September 4 visit.

On September 7, 1994, Ron's treatment team considered his request for an off-grounds pass to spend the weekend with his parents at their home. Dr. Hwang issued a pass permitting Ron to leave the grounds of OSH beginning Friday afternoon, September 9, 1994.

At the hearing, which provided the evidentiary basis for issuance of the protective custody order on August 10, 1994, evidence was presented that Ron might be a danger to himself as defined in K.S.A. 59-2902(g)(2), due to his inability to care for himself. However, no evidence was presented that would support a finding that Ron posed a danger to others. Ron denied any intent to commit suicide, and prior to his admission to OSH there was no record that Ron had ever considered or attempted suicide or acted violently towards others.

Hazel Wilhoite testified that as the ward's supervising nurse, it was her customary practice to discuss significant behavior problems or changes listed on the 24-hour shift reports every morning with Dr. Hwang. She stated that on the morning of September 9, she observed Ron talking with other people on the ward and that he replied affirmatively when she asked him if he was excited about going home. She also stated that Ron was not pacing and did not seem overly anxious about going home that morning.

Dr. Hwang testified that in his view, no aspect of Ron's recorded behavior for the 24-hour period preceding his off-grounds pass warranted revocation of that pass. In Dr. Hwang's opinion, based on his professional experience, anxiety and anticipation are normal responses of a hospitalized patient prior to the patient's first overnight pass. Thus, Ron's responses were not psychotic in Dr. Hwang's opinion. Additionally, Dr. Hwang viewed Ron's request for his anxiety medication (Thorazine) on the evening of Septem-

ber 8 and at 2:10 a.m. on September 9, as a positive indication of Ron's understanding of his mental illness and his desire to take care of himself when he heard voices or experienced other signs that he recognized as causing him problems in the past. Dr. Hwang also testified that the effect of the Thorazine would have dissipated between 6 and 8 a.m on September 9.

According to defendants, Dr. Hwang also had an opportunity to observe Ron on the morning of September 9 as he made his rounds of the ward. Dr. Hwang did not specifically speak with Ron that morning, but he did not see any behavior that he believed warranted revocation of Ron's pass. Dr. Hwang considered the potential risks of releasing Ron for a weekend pass in the custody of his parents and judged those risks to be minimal in light of Ron's lack of impulsivity since his medication change to Risperdal on August 23. Dr. Hwang's decision to allow the weekend pass included the consideration that subsequent to the medication change, Ron had been compliant with his treatment, had interacted socially, and the reports following his September 4 pass with his parents were positive. Dr. Hwang further testified that his decision to permit Ron to temporarily leave OSH on September 9 was based on complex medical judgments and an exercise of discretion as Ron's treating psychiatrist.

Plaintiffs filed a joint brief and contend that defendants owed them a duty, that defendants did not have discretionary immunity, and that defendants were "persons" subject to liability under 42 U.S.C. § 1983 (1994). The district court granted defendants' motions for summary judgment against plaintiffs, based on the following findings: OSH was not liable to plaintiffs because its duty was owed only to the public at large, given the lack of a special relationship between plaintiffs and OSH; the Nurses were not liable to plaintiffs because the decision to allow off-grounds passes was the responsibility of Dr. Hwang or one of the other staff physicians, not the Nurses; and Dr. Hwang did not owe a duty to the public at large that would give rise to a civil action by members of the general public for a possible negligent exercise of his judgment in deciding which involuntary patients should be released on a pass.

Further, the district court ruled that all defendants were immune under K.S.A. 75-6104(e) of the Kansas Tort Claims Act (KTCA). All defendants in this action were State employees at OSH, and their involvement with this matter was within the scope of their employment as members of Ron's treatment team. Thus, their decisions regarding Ron's weekend release were discretionary functions and their actions fall within the discretionary functions exception of the KTCA, K.S.A. 75-6104(e). The district court also ruled that plaintiffs' federal 42 U.S.C. § 1983 claim failed because OSH, Dr. Hwang, and the Nurses were all sued in their official, rather than individual, capacities, and that neither a state nor a state's officials acting in their official capacities are "persons" under 42 U.S.C. § 1983 unless the action is one for injunctive relief.

## I. DUTY TO PLAINTIFFS

The rules governing appellate review of a district court's grant of summary judgment are well established:

"The burden on the party seeking summary judgment is a strict one. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A defendant is entitled to summary judgment if the defendant can establish the absence of evidence necessary to support an essential element of the plaintiff's case. [Citations omitted.]" *Saliba v. Union Pacific R.R. Co.*, 264 Kan. 128, 131, 955 P.2d 1189 (1998).

Further, "[w]hen opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. [Citations omitted.]" *Saliba,* 264 Kan. at 131. Also, "[o]n appeal we apply the same rules, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied." 264 Kan. at 131-32 (citing *Mitzner v. State Dept. of SRS*, 257 Kan. 258, 260-61, 891 P.2d 435 [1995]).

Plaintiffs raise claims against all defendants under state law for theories of negligence. The liability of governmental entities for

damages caused by the acts or omissions of employees is set out under K.S.A. 75-6103(a) and provides:

"Subject to the limitations of this act, each governmental entity shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances where the governmental entity, if a private person, would be liable under the laws of this state."

The law is well settled that "[t]o recover for negligence, a plaintiff must prove the existence of a duty, breach of that duty, injury, and a causal connection between the duty breached and the injury suffered." *Washington v. State*, 17 Kan. App. 2d 518, 521, 839 P.2d 555, *rev. denied* 252 Kan. 1095 (1992) (citing *Dietz v. Atchison, Topeka & Santa Fe Rwy. Co.*, 16 Kan. App. 2d 342, 345, 823 P.2d 810 [1991]). Thus, the first question in this appeal becomes whether any of the defendants had a duty to any of the plaintiffs. The *Washington* court explained that "[a]s a general rule, in the absence of a 'special relationship', there is no duty on an actor to control the conduct of a third person to prevent harm to others." 17 Kan App. 2d at 521 (citing *McGee v. Chalfant*, 248 Kan. 434, 438, 806 P.2d 980 [1991]; Restatement [Second] of Torts § 315 [1964]).

Consequently, for defendants to be liable for negligence, they must have had a duty to plaintiffs to control Ron and prevent him from harming others. For such a duty to exist, defendants must have had some type of special relationship with the third party. Thus, the next question becomes whether a special relationship existed such that defendants had a duty. " 'Whether a duty exists is a question of law.' " *Nero v. Kansas State University*, 253 Kan. 567, 571, 861 P.2d 768 (1993) (quoting *Honeycutt v. City of Wichita*, 251 Kan. 451, Syl. ¶ 8, 836 P.2d 1128 [1992]). "This court's review of conclusions of law is unlimited." *Gillespie v. Seymour*, 250 Kan. 123, 129, 823 P.2d 782 (1991) (citing *U.S.D. No. 352 v. NEA-Goodland*, 246 Kan. 137, 140, 785 P.2d 993 [1990]).

### A. OSH and the Nurses

The district court found that the duty owed to plaintiffs by OSH was the same duty owed to the public at large. The judge based

this finding on *P.W. v. Kansas Dept. of SRS*, 255 Kan. 827, 877 P.2d 430 (1994). The plaintiffs in *P.W.* alleged a number of violations and abuses by the owner-operators of a day care center attended by their children. They claimed that the Kansas Department of Health and Environment (KDHE) and SRS were negligent in failing to revoke or suspend the license of the day care providers or to take other corrective action. The *P.W.* court held that SRS had a duty towards the public at large, but such a duty

"may be narrowed into a special duty owed to an individual where the governmental entity has performed some affirmative act that causes injury or where it had made a specific promise or representation that under the circumstances creates a justifiable reliance on the part of the person injured. SRS neither acted affirmatively, caused the injury, or made any specific promise or representation to the plaintiffs which created any justifiable reliance. Under these circumstances, SRS's statutory duty was owed to the public at large and not specifically to the plaintiffs." 255 Kan. at 835-36.

The *P.W.* court held that KDHE and SRS, the plaintiffs, and the third party (the abuser) did not fit into the special relationships set out in the Restatement (Second) of Torts §§ 314A, 316-319, and 320 (1964). Absent a special relationship, there is no duty owed under Restatement (Second) of Torts § 315. 255 Kan. at 833.

Restatement (Second) of Torts § 315 states:

"There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to protection."

Comment c to § 315 provides:

"The relations between the actor and a third person which require the actor to control the third person's conduct are stated in §§ 316-319. The relations between the actor and the other which require the actor to control the conduct of third persons for the protection of the other are stated in §§ 314A and 320."

The *P.W.* court explained:

"The special relationships set out in §§ 314A, 316-319, and 320 are those of common carriers and their passengers, innkeepers and their guests, parents and children, masters and servants, the possessors of land and licensees, persons in

charge of one with dangerous propensities, and persons with custody of another. See *McGee v. Chalfant*, 248 Kan. 434, 438, 806 P.2d 980 (1991) (citing Restatement (Second) of Torts §§ 316-320)." 255 Kan. at 832.

In the case at hand, the district court concluded that "OSH certainly did not have custody of any of the plaintiffs. Nor were any of the plaintiffs employed by OSH nor were they lodging there. The plaintiffs in these cases are members of the public at large."

The district court also rejected plaintiffs' contention that OSH had a duty to confine an involuntary patient with dangerous propensities, pursuant to the laws concerning involuntary commitment. Plaintiffs assert that *Durflinger v. Artiles*, 234 Kan. 484, 673 P.2d 86 (1983), *overruled in part by Boulanger v. Pol*, 258 Kan. 289, 900 P.2d 823 (1995), and K.S.A. 1973 Supp. 59-2902, the involuntary commitment statute applicable in *Durflinger*, are authoritative. Plaintiffs maintain that *Durflinger* established that the source of the duty owed to plaintiffs for negligently releasing a patient was the involuntary commitment statutes.

In *Durflinger*, this court noted that "the particular area of the law of negligence with which we are concerned herein is that of medical malpractice. Negligence is an essential element of a medical malpractice action." 234 Kan. at 489. The *Durflinger* court then summarized the duties of physicians to their patients as an obligation to use reasonable and ordinary care and diligence in the treatment of cases undertaken, to use his or her best judgment, and to exercise "that reasonable degree of learning, skill and experience which is ordinarily possessed by other physicians in the same or similar locations." 234 Kan. at 489 (citing *Malone v. University of Kansas Medical Center*, 220 Kan. 371, 375, 552 P.2d 885 [1976]). Likewise, hospitals owe a duty to their patients to exercise reasonable care, and registered nurses owe the same duty of care to their patients as physicians. 234 Kan. at 489-90; see *Hiatt v. Groce*, 215 Kan. 14, 523 P.2d 320 (1974).

The *Durflinger* appellants were a psychiatrist and two physicians involved in making the recommendation to discharge Bradley Durflinger from Larned State Hospital (LSH). The facts in *Durflinger* are similar to this case in that both Ron and Bradley were involuntarily committed mental patients, and both tragically killed an-

other person(s) while away from the hospital. The rest of the facts in *Durflinger*, however, make it distinguishable from the present case.

In *Durflinger*, Bradley attempted to kill his grandparents with a hatchet and a meat fork and steal their car. Prior to the planned attack on his grandparents in December 1973, Bradley was discharged from the Navy for being absent without leave, attempted suicide in March 1973, and was placed on probation for shoplifting in November 1973. In January 1974, the probate court found Bradley to be a mentally ill person and ordered that he be given care and treatment at LSH. Bradley was diagnosed by the doctors at LSH as "having a passive-aggressive personality with sociopathic tendencies. On April 19, 1974, Bradley was discharged from the hospital as being no longer in need of care or treatment." 234 Kan. at 486. The day that he was discharged, his grandparents put him on a plane to Oregon where he would reside with his parents and siblings. One week later, Bradley killed his mother and younger brother by shooting each person several times with a rifle.

Relatives of the deceased brought a wrongful death action against all of the doctors employed at LSH at the time of Bradley's commitment. Plaintiffs' theory of liability was predicated on Bradley's alleged negligent release from the hospital. A jury returned a verdict in favor of plaintiffs, and defendants appealed to the United States Court of Appeals for the Tenth Circuit. The Appellate Court certified two questions of law as being substantively determinative of the appeal and entirely subject to Kansas law. The certified question applicable to our analysis in the present case was whether the Kansas Supreme Court would "recognize as a valid cause of action a claim which grew out of a negligent release of a patient who had violent propensities, from a state institution, as distinguished from negligent failure to warn persons who might be injured by the patient as the result of the release?" *Durflinger*, 234 Kan. at 485.

The *Durflinger* court answered the question affirmatively and held:

"The making of the recommendation by the physicians to discharge or retain Bradley as a patient was a basic part of their professional employment. This professional duty obviously was for the benefit of Bradley and the public. We find

no rational basis for insulating this one aspect of professional service from liability for negligence occurring in the performance thereof. The aforementioned standards for medical malpractice actions are applicable to an action for negligent release of a patient from a mental hospital." 234 Kan. at 492.

Bradley's grandfather filed a petition for Bradley's commitment the day after Bradley had attempted to kill his grandparents. The petition alleged that Bradley was dangerous to himself or others. The *Durflinger* court stated that "[c]learly he was committed to the hospital because he was dangerous to other persons." 234 Kan. at 492. The hospital was required to provide care or treatment for Bradley and to discharge Bradley only when he was no longer in need of care or treatment within the purview of K.S.A. 1973 Supp. 59-2924. The *Durflinger* court held that this meant he should not have been discharged until he was "no longer dangerous to himself or *others*." 234 Kan. at 492.

The following paragraph from *Durflinger* essentially defeats plaintiffs' theory that *Durflinger* mandates a special relationship, creating a duty owed to them by defendants:

"In actions where liability is predicated on negligent release of a patient from a mental hospital, general rules of negligence and medical malpractice control and there is no reason to apply the concept of special relationship and the resulting affirmative duty to take some special step to protect a third party or the public. We are not called upon in this case to decide whether, in Kansas, liability may be predicated upon a therapist's failure to warn a victim or failure to detain based upon a special relationship and, accordingly, decline to decide such issues in this opinion." 234 Kan. at 499.

Despite the *Durflinger* court's express statement that its decision was not based on a special relationship, with a specific duty owed to an injured party, plaintiffs insist that *Durflinger* mandates a finding in their case that defendants owed them a duty. Plaintiffs further contend that *Durflinger* is controlling because the involuntary commitment statute in effect at the time *Durflinger* was decided is virtually identical to the 1994 version under which Ron was committed. Although the two statutes are similar, the plaintiffs' argument is flawed.

As the *Durflinger* court noted, K.S.A. 1973 Supp. 59-2902 provided in pertinent part:

" '(1) The term "mentally ill person" shall mean any person who is mentally impaired, except by reason of mental deficiency only, to the extent that he is in need of "care or treatment" and *who is or probably will become dangerous to himself or the person or property of others* if not given "care and treatment" and

'(A) who lacks sufficient understanding or capacity to make responsible decisions with respect to his need for "care or treatment", or

'(B) who refused to seek "care or treatment" . . . .' " *Durflinger*, 234 Kan. at 491-92.

Plaintiffs rely on this involuntary commitment statutory language to sustain their argument that because Ron was deemed mentally ill when he was committed, he remained mentally ill within the meaning of each element of the statute throughout his confinement at OSH. Plaintiffs make a leap in logic in arguing that because Ron was, by definition, mentally ill, he was always a danger to himself and others while committed to OSH pursuant to the statutory definition. In 1994, when Ron was involuntarily committed, as well as when he was released on the weekend pass, K.S.A. 59-2902 provided the following pertinent definitions:

"(d) 'Involuntary patient' means a mentally ill person who is receiving treatment under order of a court of competent jurisdiction.

. . . .

"(h) 'Mentally ill person' means any person who:

(1) Is suffering from a severe mental disorder to the extent that such person is in need of treatment;

(2) lacks capacity to make an informed decision concerning treatment; and

(3) is likely to cause harm to self or others."

The judge characterized plaintiffs' analysis as concluding that since Ron was in need of care and treatment, he was, by definition of law, dangerous to himself and others. Therefore, OSH had a duty to simply confine Ron until released by court order or until he was in no further need of treatment. The statute does not support such a theory.

In the more recent case of *Boulanger v. Pol*, 258 Kan. 289, 900 P.2d 823 (1995), Darrell Boulanger (plaintiff) brought an action for personal injuries sustained when he was shot by Ron Hill, who had been discharged from an intermediate health care facility 10 days earlier. Hill suffered from physical and mental disabilities as a result of a brain injury and had become convinced that his uncle,

Boulanger, was "the devil incarnate." 258 Kan. at 290. The trial court granted summary judgment in favor of Dr. Pol and Applewood Care Center, Inc. (defendants).

On appeal, plaintiff claimed that defendants were negligent in releasing Hill. Plaintiff also asserted that defendants had assumed the care of a dangerous person, and, thus, they had a duty to warn him of Hill's discharge. The *Boulanger* court held:

"Careful consideration of our language in *Durflinger* indicates that the court's references to medical malpractice were directed to the proof necessary to establish liability based upon ordinary negligence principles once a duty was shown to exist. . . . . Our language in *Durflinger* to the effect that the cause of action is one of medical malpractice is disapproved." 258 Kan. at 298.

The *Boulanger* court also stated that "[t]he cause of action for negligent release of an involuntary mental patient recognized in *Durflinger* is inapplicable to, and does not create a cause of action for, the alleged negligent release of a voluntary patient." 258 Kan. 289, Syl. ¶ 4. Thus, plaintiffs in the present case argue that *Durflinger* clearly grants them a cause of action for Ron's negligent release.

The *Boulanger* court provided a concise review of many of the cases analyzing § 315 and § 319 of the Restatement (Second) of Torts:

"Kansas courts have recognized an affirmative duty to protect third persons from harm based on the special relationship analysis set forth in § 315. See *C.J.W. v. State*, 253 Kan. 1, 11-12 [853 P.2d 4 (1993)]. (State has duty to warn juvenile officials of child's known violent propensities and protect other children in custody from violent child); *Washington v. State*, 17 Kan. App. 2d 518, Syl. ¶ 2, 839 P.2d 555, *rev. denied* 252 Kan. 1095 (1992) (prison officials owe duty of reasonable care to safeguard prisoners from attack by other prisoners; duty not violated unless danger was known or should have been known); *Cansler v. State*, 234 Kan. 554, 564, 675 P.2d 57 (1984) (State has duty to confine inmates securely and to notify area residents and law enforcement when inmates escape). In *Robertson v. City of Topeka*, 231 Kan. 358, 364, 644 P.2d 458 (1982), the court recognized a special relationship also exists when one who creates a foreseeable peril, not readily discoverable, fails to warn. Most recently, the court found a special relationship did not exist in *Nero v. Kansas State University*, 253 Kan. 567, 861 P.2d 768 (1993) (the University did not have type of custody or control over students contemplated by § 315 to establish a special relationship), and *P.W. v. Kansas Dept. of SRS*, 255 Kan. 827, 833, 877 P.2d 430 (1994) (no duty of State to prevent child abuse in

private, licensed child care center because State had not created the peril and special relationship did not exist). It must be conceded that all of the foregoing cases are fact specific, and the results reached were dictated by the facts in each case." 258 Kan. at 304.

In *Schmidt v. HTG, Inc.,* 265 Kan. 372, 961 P.2d 677, *cert. denied* 525 U.S. 964 (1998), the court analyzed whether there was a special relationship such that a duty was created. The *Schmidt* court noted that in order to support the assertion that a duty is owed to protect third persons, a special relationship must exist between a parole officer and a parolee. 265 Kan. at 384. Thus, the *Schmidt* court held:

"We first determine if the trial court correctly concluded Schirk was 'in charge of' Gideon to the extent necessary to form a § 319 special relationship and, if it did, whether the duty to protect third parties extends to and includes a duty to warn either the public at large or a limited class of persons having a current or previous involvement with the parolee." 265 Kan. at 384.

Even if this court found that a special relationship existed, the question of whether the duty to control extends to a duty to warn potential victims would remain. The *Schmidt* court stated that even if a special relationship existed to control Gideon's conduct, the Kansas Department of Corrections (KDOC) and Schirk owed no duty under § 315 to warn Stephanie Schmidt about Gideon's dangerous propensities in the absence of an express threat. In the case at hand, there is sufficient evidence that Ron never had dangerous propensities toward others, only toward himself. Thus, following the *Schmidt* holding, even if we determined that Ron did have dangerous propensities, the record provides no evidence of any express threat to Joy or Arthur Fulton, or any threat at all.

In conclusion, defendants did not have a special relationship with plaintiffs, and, thus, did not owe them a duty greater than the duty they owed the public at large. As the *P.W.* court stated: "An actor has no duty to control the conduct of a third person to prevent that person from causing harm to others unless a special relationship exists between the actor and the third party or the actor and the injured party." 255 Kan. 827, Syl. ¶ 2. Given that the existence of a duty is the first necessary element to establish a cause of action

for negligence, the district court did not err in granting summary judgment to defendants on this issue.

## B. Dr. Hwang

The basic premise of plaintiffs' allegations against Dr. Hwang is that Ron was a person with dangerous propensities as defined by Restatement (Second) of Torts § 319. Because Ron was a person with dangerous propensities, Dr. Hwang owed plaintiffs a duty to protect them from Ron. Plaintiffs further assert that it was or should have been foreseeable by Dr. Hwang that Ron would grab the steering wheel of the car while Joy was driving and force it into oncoming traffic. Dr. Hwang argues that Ron was not a person with dangerous propensities as defined by § 319 and maintains that plaintiffs' claim of foreseeability is not supported by the facts.

Dr. Hwang states that members of the hospital staff who observed Ron's conduct on the evening of September 8, as well as on the morning of September 9, and who were familiar with chart entries made during those times, did not believe that Ron's behavior warranted revocation of his weekend off-grounds pass.

Plaintiffs argue that defendants premise their opposition to the existence of a duty on the factual issue that Ron was not a person with dangerous propensities as defined by § 319. They maintain that Dr. Hwang cannot make this conclusion because whether Ron had dangerous propensities is a question of fact, and, as such, summary judgment on this point was inappropriate.

In *Cansler v. State*, 234 Kan. 554, Syl. ¶ 1, 675 P.2d 57 (1984), the court stated:

"It is the rule in this state that one who takes charge of a third person, whom he knows or should know to be likely to cause bodily harm to others if not controlled, is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm. (Restatement [Second] of Torts § 319 [1964])."

The *Cansler* facts make it readily distinguishable from the case at hand. In *Cansler*, seven inmates, all of whom were serving life sentences, escaped from the Kansas State Penitentiary. The *Cansler* court held:

"We adopt the rule set forth in Restatement (Second) of Torts § 319 (1964) as the law of this state governing the duty of those in charge of persons having dangerous propensities. In the case before us, it can hardly be argued that the State did not have a duty to confine, and confine securely, the seven escapees, all of whom are alleged to have been serving life terms after conviction for murder in various degrees. Their dangerous propensities, especially when they were heavily armed, are obvious." 234 Kan. at 564.

The *Cansler* court noted that the duty of the State to exercise reasonable care is clearly commensurate with the risk. There was a very high risk of immediate harm, personal injury, or death, to nearby residents or police officers created by heavily armed "convicted murderers serving life terms who escape from the confines of a maximum security prison." 234 Kan. at 565. *Cansler* ruled that the State had a duty, given the availability of modern communication, to notify area residents by some method "as soon as a major escape such as this was known to prison officials. It further had a duty to notify area law enforcement officials promptly through the usual police communication channels." 234 Kan. at 565. Thus, the State, as the custodian of dangerous persons, has a duty to warn when dangerous inmates escape.

In the case before us, even prior to Ron's change in medication on August 23, 1994, there is no evidence that Ron ever caused another person bodily harm or threatened to cause harm to anyone. It is not disputed that before Ron's medication was changed, he had tried to escape from OSH two times.

After Ron's change in medication, however, there were no escape attempts and Ron ceased to act impulsively, interacted socially, and was compliant with his treatment. Therefore, Dr. Hwang maintains that there was no factual basis from which he should have concluded that Ron was violent or likely to become violent after the medication change.

Because Ron never demonstrated any likelihood that he would cause bodily harm to others, he was not a person having dangerous propensities as defined by § 319, and Dr. Hwang had no duty extending to plaintiffs based on § 319.

## II. DISCRETIONARY IMMUNITY

Having decided that defendants owed no duty to plaintiffs, we

need not base our decision on whether the Kansas Tort Claims Act (KTCA) provides defendants immunity from plaintiffs' claims under the KTCA. However, defendants' conduct in granting Ron a temporary weekend pass from OSH, or their failure to revoke the pass due to Ron's behavior on September 8 and the morning of September 9, clearly falls within the discretionary function exception of K.S.A. 75-6104(e).

The *Schmidt* court examined the discretionary function exception and noted:

" 'Discretion implies the exercise of discriminating judgment within the bounds of reason. [Citation omitted.] It involves the choice of exercising of the will, of determination made between competing and sometimes conflicting considerations. Discretion imparts that a choice of action is determined, and action should be taken with reason and good conscience in the interest of protecting the rights of all parties and serving the ends of justice.' " *Schmidt*, 265 Kan. at 392 (citing *Hopkins v. State*, 237 Kan. 601, 610, 702 P.2d 311 [1985]).

The *Schmidt* court also provides a succinct review of recent cases dealing with the discretionary function exception to the KTCA:

"[W]e recently decided in Woodruff [*v. City of Ottawa*], 263 Kan. 557 [, 951 P.2d 953 (1997)], that the decision whether to take an intoxicated individual into custody is discretionary and entitled to immunity. In *Bolyard* [*v. Kansas Dept. of SRS*], 259 Kan. 447, 912 P.2d 729 (1996), we ruled that SRS's decision to temporarily place children with their mother was entitled to immunity under the discretionary function exception. In *G. v. State Dept. of SRS*, 251 Kan. 179, 833 P.2d 979 (1992), we held the removal of a child from a foster care home by SRS was within the discretionary function exception."

"In *Beebe v. Fraktman*, 22 Kan. App. 2d 493, 921 P.2d 216 (1996), the Court of Appeals held that the decision whether to open a file for investigation of allegations of child abuse is a discretionary function. That court also held in *Burney v. Kansas Dept. of SRS*, 23 Kan. App. 2d 394, 931 P.2d 26 (1997), that the manner of conducting an investigation into a charge of child abuse is a discretionary function." 265 Kan. at 392-93.

Dr. Hwang's decisions regarding the authorization of off-grounds passes for Ron were based upon complex medical judgments and were the result of his discretion, taking into account such medical judgments.

In conclusion, in the present case, the discretionary function exception applies to defendants. Defendants were required to bal-

ance restricting Ron's freedom with providing him the opportunity to experience life outside of the hospital setting such that he could learn to function in society on his own. Dr. Hwang made the discretionary decision that since Ron's change in medication, he had not tried to escape, had behaved properly, had interacted socially in an appropriate manner, and was following his treatment. Further, defendants had received only positive comments about Ron's behavior when his parents took him for a 4-hour pass on September 4, 1994.

### III. 42 U.S.C. § 1983

The district court granted summary judgment to all defendants regarding plaintiffs' 42 U.S.C. § 1983 action. This statute provides in pertinent part:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proceeding for redress."

The district court stated that in order to establish a § 1983 action, plaintiffs must show "(1) the deprivation of a federal right by (2) a person acting under color of state law."

The district court ruled that because Dr. Hwang and the Nurses were all sued in their official capacities, rather than their individual capacities, "they cannot be considered as 'persons' liable for violations of 42 U.S.C. § 1983. The defendants are entitled to summary judgment on this point as a matter of law." The district court noted that *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 105 L. Ed. 2d 45, 109 S. Ct. 2304 (1989), held that "neither a State nor its officials acting in their official capacities are 'persons' under [42 U.S.C.] § 1983," unless the action is one for injunctive relief. Plaintiffs concede that OSH is not a "person" under § 1983. Plaintiffs argue, however, that neither Dr. Hwang nor the Nurses mention anything with regards to the capacity in which they were sued by plaintiffs in their motions for summary judgment.

Plaintiffs thus contend that the district court erroneously determined that there were no disputed material facts precluding it from

entering summary judgment for the individual defendants because they were sued in their official capacities. Plaintiffs argue that the district court erred in finding that defendants were not "persons" within § 1983. They cite *Hafer v. Mello*, 502 U.S. 21, 116 L. Ed. 2d 301, 112 S. Ct. 358 (1991), as authority that "state officials sued in their individual capacities are 'persons' for purposes of § 1983." 502 U.S. at 23. The *Hafer* Court stated that personal-capacity suits, in contrast to official-capacity suits, "seek to impose individual liability upon a government officer for actions taken under color of state law. Thus, '[o]n the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right.'" 502 U.S. at 25 (citing *Kentucky v. Graham*, 473 U.S. 159, 166, 87 L. Ed. 2d 114, 105 S. Ct. 3099 [1985]).

Assuming, but not deciding, that plaintiffs sued defendants in their individual capacities, rather than in their official capacities, summary judgment for defendants was still appropriate. In *De-Shaney v. Winnebago Cty. Soc. Servs. Dept.*, 489 U.S. 189, 103 L. Ed. 2d 249, 109 S. Ct. 998 (1989), the Court analyzed whether the district court had erred in granting summary judgment in favor of respondents, the Winnebago County Department of Social Services (DSS), and various employees of DSS. In *DeShaney*, 4-year-old Joshua DeShaney was beaten by his father so severely that he suffered permanent brain damage. Joshua and his mother brought a § 1983 action alleging that respondents had deprived Joshua "of his liberty without due process of law, in violation of his rights under the Fourteenth Amendment, by failing to intervene to protect him against a risk of violence at his father's hands of which they knew or should have known." 489 U.S. at 193. The *Deshaney* court stated:

"[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

Nor does history support such an expansive reading of the constitutional text." 489 U.S. at 195.

Similarly, in *Schmidt*, the court held that plaintiffs' § 1983 claim failed because they had not shown that their claim fell under one of the following exceptions to the general rule that a State actor may not be held liable under the Due Process Clause to the United States Constitution for private misdeeds: (1) the special relationship doctrine or (2) the danger creation theory. The *Schmidt* court explained:

"Federal courts have established the elements necessary for proving this second exception: (1) The plaintiff/victim must be a member of a limited and specifically definable group; (2) the defendant's conduct specifically put members of that group at substantial risk of serious, immediate, and proximate harm; (3) the risk was obvious or known; (4) the defendant acted recklessly in conscious disregard of that risk; and (5) the conduct, when viewed in the totality of the circumstances, is shocking to the conscience. *Collins v. Harker Heights*, 503 U.S. 115, 117 L. Ed. 2d 261, 112 S. Ct. 1061 (1992); *Medina v. City and County of Denver*, 960 F.2d 1493 (10th Cir. 1992)." 265 Kan. at 380.

The *Schmidt* court stated that the trial court correctly "focused on the definition of reckless conduct as an awareness or knowledge of an obvious risk that was so great that it was highly probable that serious harm would follow and he or she proceeded in conscious and unreasonable disregard of the consequences. *Medina*, [960 F.2d at] 1496." 265 Kan. at 381.

In *Collins v. Harker Heights*, 503 U.S. 115, 128, 117 L. Ed. 2d 261, 112 S. Ct. 1061 (1992), the Court held that the plaintiff had not established a § 1983 action because the city's alleged wrongs could not be characterized as "arbitrary, or conscience shocking in a constitutional sense." The *Collins* Court stated that the Due Process Clause should not be interpreted to exact federal duties that are analogous to those duties historically imposed by state tort law, and that "[t]he Due Process Clause 'is not a guarantee against incorrect or ill-advised personnel decisions.' " 503 U.S. at 129 (citing *Bishop v. Wood*, 426 U.S. 341, 350, 48 L. Ed. 2d 684, 96 S. Ct. 2074 [1976]).

Given our holding that plaintiffs could not prove negligence, it would be impossible to find that defendants' conduct was reckless.

Defendants clearly did not have an awareness or knowledge of an obvious risk that was so great that it was highly probable that serious harm would follow from their actions. Defendants did not allow Ron to leave on the weekend pass with conscious and unreasonable disregard of the consequences. Therefore, assuming defendants were sued in their individual capacities, the trial court nevertheless reached the correct result when it granted summary judgment in favor of defendants. "[A] trial court's reason for its decision is immaterial if the ruling is correct for any reason. [Citation omitted.]" *KPERS v. Reimer & Koger Assocs., Inc.*, 262 Kan. 110, 118, 936 P.2d 714 (1997).

Plaintiffs have failed to demonstrate that defendants were aware of a risk so great to plaintiffs that it was highly probable that serious harm would occur by allowing Ron a weekend off-grounds pass to be spent at his parents' house with his parents. Plaintiffs have not shown that defendants proceeded with conscious and unreasonable disregard of probable consequences. Likewise, plaintiffs have not shown that defendants acted with an intent to harm plaintiffs, or *with* an intent to place them in a situation involving an unreasonable risk of harm. Thus, defendants' actions fall short of a cogent § 1983 claim.

Affirmed.