(261 P.3d 943)
No. 104,246

The Estate of JEFFREY RAY BELDEN, MARIE GASTON, Administratrix, and MARIE GASTON, Survivor and Heir of JEFFREY RAY BELDEN, *Appellants*, v. BROWN COUNTY, KANSAS; THE COUNTY COMMISSIONERS OF BROWN COUNTY, KANSAS; LAMAR SHOEMAKER, Individually and as Sheriff of Brown County, Kansas; BRETT HOLLISTER; and BRANDON ROBERTS, *Appellees*.

cible in the trial of the case.

250

*Robert R. Laing, Jr.*, of Kansas City, for appellants.

*Carolyn L. Matthews*, of Foulston Siefkin LLP, of Wichita, and *Wendell F. Cowan*, of Foulston Siefkin LLP, of Overland Park, for appellees.

Before GREENE, C.J., HILL and ATCHESON, JJ.

ATCHESON, J.: On August 14, 2002, Jeffrey Ray Belden died by his own hand while in custody at the Brown County jail. Belden had been held there for about 7 weeks awaiting trial. He was 21 years old. Over the past decade, Belden's heirs and his estate, suing through Belden's mother Marie Gaston, have pursued civil litigation against Brown County, the county sheriff, and several jail employees on the basis they failed to take legally required precautions that would have prevented the suicide. The litigation started in federal court and asserted federal constitutional and state tort claims. After the constitutional claims were thrown out, the federal court dismissed the state law claims without prejudice for lack of jurisdiction. Belden's heirs and estate filed this case in Brown County reasserting the state claims. They sued Brown County through its board of commissioners, individual commissioners, Brown County Sheriff Lamar Shoemaker, Sheriff's Sgt. Brett Hollister, and Deputy Brandon Roberts. They alleged: a breach of the duty of care owed Belden as a pretrial detainee based on the events immediately preceding his suicide; legally inadequate jail facilities and procedures; and negligent hiring, training, and supervision of jail personnel.

On February 17, 2010, the Brown County District Court granted Defendants' motion for summary judgment on all of those claims. Without a request from Defendants, the district court found that res judicata, based on the federal suit, required dismissal. The court erred. The district court also found that collateral estoppel applying particular factual findings in the federal litigation barred the state

claims. That ruling was correct as to any liability theory dependent upon Defendants' actual knowledge that Belden was suicidal but erroneous as to those theories premised on grounds that Defendants should have known or were otherwise negligent. Finally, the district court alternatively ruled that the undisputed facts failed to support any basis for imposing tort liability on Defendants. The trial court erred in that determination on the breach of duty claim. The record contains disputed material facts that if resolved in favor of Belden's estate and heirs would allow a jury to return a verdict for them on that theory against Sgt. Hollister and Deputy Roberts. Brown County would be liable as a matter of law for a judgment entered on such a verdict.

We, therefore, affirm in part, reverse in part, and remand for further proceedings.

Given the duration of this litigation in two forums, the paper trail is a long one. The parties have walked that trail and know it well. In this opinion, we do not intend to detail in full the facts surrounding Belden's death or the history of the resulting legal proceedings. Rather, we will recite only those portions of the facts and the history salient to the determination that summary judgment should not have been granted on all claims. The parties will find the narrative of the underlying facts abbreviated. At the same time, the legal proceedings in both federal and state court and their interplay figure substantially in how the res judicata and collateral estoppel issues shake out. We devote more attention to the history of the litigation than might be typical in an appellate decision.

### THE FACTS

Belden was booked into the Brown County jail on June 26, 2002, on a felony drug possession charge. He could not post bail and remained in custody awaiting trial or some other disposition of the criminal case. Nothing in the booking process or the intake information Belden provided suggested he had suicidal tendencies or other mental health issues. At some point, Belden was placed with several other inmates in a cell designed for four persons.

After Belden had been in the Brown County jail for awhile, other inmates observed him pacing while clenching his fists. Sometimes,

Belden would sit, rock back and forth, and cry. One inmate in the same four-person cell with Belden for a week or so before the suicide said he was "always" rocking and crying and that behavior became "more noticeable" during the last several days of his life. Belden told at least a few other inmates he was worried about going to prison and expressed distress at not being able to communicate readily with his lawyer. Belden supposedly made comments to other inmates suggesting at least a passing consideration of suicide. Several days before his death, Belden had pretty much stopped eating and gave his food to the others in the cell. None of those prisoners reported their observations to jail employees before Belden's suicide. Afterwards, they recounted that information for agents from the Kansas Bureau of Investigation reviewing the circumstances of Belden's death.

On August 14, Sgt. Hollister, who served as the jail administrator, suspected Belden had tampered with the window in the cell so he could receive notes and possibly other contraband from his girlfriend. Around midday, Sgt. Hollister told Belden he would be moved to another cell. Belden asked to be placed in a one-person cell, and Sgt. Hollister accommodated that request. After complaining the television in the cell didn't work and asking to be moved again, Belden stopped up the toilet, flooding the cell. Belden was then moved to another one-person cell.

As he was leaving the jail for the day, Sgt. Hollister told Deputy Roberts that Belden had been placed in the single cell for disciplinary reasons. Deputy Roberts distributed the evening meal to the inmates. Belden threw his iced tea on the floor and refused to return to his cell. Deputy Roberts called for assistance. Deputy Doug Brammer, who had just come on duty, entered the jail with a mace canister prompting Belden to return to his cell.

Deputy Roberts had received no formal training in dealing with inmates. He received guidance from more experienced officers and characterized that as on-the-job training. During the evening of August 14, Deputy Roberts was the only law enforcement officer stationed in the jail. The jail had 19 male inmates and 4 female inmates that day.

At about 6:40 p.m., according to the jail log, Deputy Roberts saw that Belden had covered the observation window in his cell door with paper. The facility's procedures prohibit inmates from obscuring the windows for obvious reasons—the jailers can't see what's going on in the cell. At least one inmate recalled Belden had covered the window by the time the meal trays were collected; the jail log records the tray pickup at 6:05 p.m.

Deputy Roberts at least twice ordered Belden to remove the paper. Belden responded by cursing and threatening to violently resist any effort by Deputy Roberts to clear the window. Deputy Roberts called Sgt. Hollister, his direct supervisor, at home for guidance on how to handle the situation. According to Sgt. Hollister's report, he told Deputy Roberts to wait until another officer became available to assist him and then to enter the cell, take down the paper, "remove all items" from Belden, and move Belden to Cell 14. Based on various records and other evidence, Deputy Roberts placed the call to Sgt. Hollister between 6:40 and 6:45 p.m.

Cell 14 was used to house persons needing close monitoring. Inmates believed to be suicidal were to be placed in Cell 14. Intoxicated arrestees were placed there, as were others with acute health issues. Sgt. Hollister did not specifically tell Deputy Roberts why Belden should be placed in Cell 14. Jail procedures required that persons in Cell 14 be monitored every 15 minutes. The established jail procedures called for checking the general inmate population on an hourly basis.

In his deposition, Deputy Roberts testified he walked by Belden's cell several times and spoke to him. According to Deputy Roberts, Belden responded. In a report he wrote on August 14, Deputy Roberts describes talking to Belden shortly before the call to Sgt. Hollister and again about 7:45 p.m. But in the report, Deputy Roberts mentions no other contact with Belden. Deputy Roberts also testified that just before 7 p.m. he told the dispatcher he needed another officer to come to the jail to assist with moving Belden to Cell 14. The jail log does not include a record of that communication, although Sgt. Hollister testified it should have been noted. Deputy Roberts did record other events from that evening in the log, such as serving meals, writing a report on Bel-

den's throwing his iced tea, handling a family visit for another inmate, and writing a report on Belden's cell window being covered.

About 8:15 p.m., Deputy Roberts got an inmate trusty out of his cell to do laundry. Because the trusty knew Belden and no other sheriff's deputy had yet arrived at the jail, Deputy Roberts and the trusty went to the cell to take the paper off the window. They had trouble opening the door to the cell. After pushing the door about a foot, Deputy Roberts saw Belden on the floor with a bed sheet tied around his neck and fastened to the door handle.

Deputy Roberts called for an ambulance. Deputy Brammer, who was in the adjacent Sheriff's Department, heard the dispatcher's radio request and went to the jail at 8:18 p.m., according to a report he prepared at the time. The two deputies cut the bed sheet and attempted emergency resuscitation of Belden until the ambulance arrived. Deputy Brammer is a trained EMT. In his report, he described Belden as blue and without a pulse. In a later affidavit, Deputy Brammer stated that by the time he got to the jail, Belden probably had been dead for half an hour because the body was cool and clammy. Belden was taken to an area hospital where he was formally pronounced dead at 8:51 p.m.

Belden was the first inmate to commit suicide in Sheriff Shoemaker's 5-year tenure. Sheriff Shoemaker estimated that in that time between 75 and 100 inmates had either attempted suicide or made suicidal threats prompting jail personnel to seek intervention by an area mental health care provider on call for that purpose.

PROCEDURAL HISTORY

Belden's estate and heirs filed suit against Defendants in the United States District Court for the District of Kansas on August 6, 2004, shortly before the statute of limitations would have run. In addition to the state law tort claims at issue in this case, Plaintiffs alleged that the county, the sheriff, and the deputies violated Belden's constitutional rights under the Eighth Amendment to the United States Constitution, prohibiting cruel and unusual punishment, and the Fourteenth Amendment, securing both procedural and substantive due process. The statutory vehicle for asserting constitutional claims is 42 U.S.C. § 1983 (2000). We have no oc-

casion to consider independently the merits of the constitutional claims or the disposition of those claims in federal court. Rather, as we discuss, the way that suit progressed bears on the proper analysis of the res judicata and collateral estoppel issues in this case.

Defendants moved for summary judgment in federal court. The district court found disputed issues of material fact precluded judgment, except as to the constitutional claims asserting individual liability against the Brown County commissioners. *Gaston v. Ploeger*, 399 F. Supp. 2d 1211, 1227 (D. Kan. 2005), *rev'd in part* 229 Fed. Appx. 702 (10th Cir. 2007). The district court also ruled that Sheriff Shoemaker, Sgt. Hollister, and Deputy Roberts were not entitled to qualified immunity on the constitutional claims. 399 F. Supp. 2d at 1224. For reasons we needn't get into here, government agents may take immediate, interlocutory appeals of orders denying them qualified immunity. *Howards v. McLaughlin*, 634 F.3d 1131, 1138-39 (10th Cir. 2011). Sheriff Shoemaker and Sgt. Hollister exercised their procedural prerogative to do so.

In resolving qualified immunity defenses, the courts consider two connected issues: whether the conduct alleged actually violates a protected constitutional right and, if so, whether the right was sufficiently clearly established that the government agent should have known that his or her conduct amounted to a violation. *Wilson v. Layne*, 526 U.S. 603, 609, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999); *Siegert v. Gilley*, 500 U.S. 226, 231-32, 111 S. Ct. 1789, 114 L. Ed. 2d 277 (1991). The constitutional violations alleged in the federal suit required that the offending government actors knew Belden was suicidal on August 14 and did nothing or were deliberately indifferent to his mental state. *Barrie v. Grand County, Utah*, 119 F.3d 862, 868-69 (10th Cir. 1997). In that context, deliberate indifference includes "disregard[ing] a known or obvious risk that is very likely to result in the violation of a prisoner's constitutional rights." 119 F.3d at 869. The standard requires a degree of willfulness absent from negligence, gross negligence, or recklessness resulting in common law tort liability. 119 F.3d at 869; see *Canton v. Harris*, 489 U.S. 378, 390, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989) (Deliberate indifference entails an "obvious" need for government action to prevent a constitutional

injury and circumstances in which the failure to act is so likely to result in that injury as to be apparent.).

Against that legal backdrop, the United States Court of Appeals for the Tenth Circuit held that Belden's estate and heirs had failed to present sufficient evidence to withstand summary judgment on whether Sheriff Shoemaker and Sgt. Hollister knew Belden was suicidal or were deliberately indifferent to his status. *Gaston*, 229 Fed. Appx. at 712-13. The federal Court of Appeals did not consider Deputy Roberts' qualified immunity claim because he had been omitted from the notice of appeal. But the court made clear that he could reassert his immunity claim at the trial level. 229 Fed. Appx. at 709 and n.5.

On remand, the federal district court held that, in light of the reasoning of the appellate court, Deputy Roberts should be shielded by qualified immunity. *Gaston v. Ploeger*, No. 04-2368-DJW, 2008 WL 169814, at *14 (D. Kan. 2008) (unpublished opinion). The dismissal of the constitutional claims against Deputy Robert left only state law claims in the federal court action. Federal court jurisdiction had been based on the constitutional claims, as provided in 28 U.S.C. § 1331 (2000). There was no complete diversity of citizenship to support federal jurisdiction under 28 U.S.C. § 1332.

Using the jurisdictional foundation the constitutional claims created, Belden's estate and heirs properly included the state law claims when they filed the federal suit. They relied on supplemental jurisdiction under 28 U.S.C. § 1367(a) (2000). The supplemental jurisdiction statute essentially codifies the common-law doctrine of pendent jurisdiction allowing a plaintiff to join closely related state and federal claims in a single suit in federal court rather than filing separate actions in each forum. See *Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966) (defining pendant jurisdiction); *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1266 (D.C. Cir. 1995) (noting that 28 U.S.C. § 1367 "essentially codifies" pendent jurisdiction as outlined in *Mine Workers*); *Wright v. Associated Ins. Companies, Inc.*, 29 F.3d 1244, 1250-51 (7th Cir. 1994) (same). Supplemental jurisdiction promotes judicial efficiency and fairness to the parties by

allowing related state and federal claims to be resolved in a single action. *Mine Workers*, 383 U.S. at 726.

If the claims that supported federal jurisdiction in the first place have been dismissed, as happened here, the federal court *may* decline to proceed solely on the remaining state law claims. 28 U.S.C. § 1367(c)(3) (The trial court may decline to exercise supplemental jurisdiction if all of the claims providing original federal jurisdiction have been dismissed.). The decision to dismiss rests in the federal court's sound discretion. *Wright*, 29 F.3d at 1251. Typically, however, a federal court will dismiss the state law claims without prejudice to allow the plaintiff to refile them in state court.

The reason for dismissal lies in a pragmatic bow to comity: state courts generally should decide issues of state law, and federal courts, as courts of limited jurisdiction, should not. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988) (When all federal claims have been eliminated before trial, a federal court typically should decline jurisdiction over the remaining state claims in the interests of comity.). Under 28 U.S.C. § 1367(d), plaintiffs dismissed from federal court because only state law claims remain in their suits get a 30-day window to refile in state court, even if any statute of limitations may have expired during the pendency of the federal litigation.

A federal court may retain jurisdiction over state law claims and should do so if some state rule might limit or preclude a plaintiff's access to the state forum. See *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514, 126 S. Ct. 1235, 163 L. Ed. 2d 1097 (2006) (When a federal court dismisses federal claims, it "generally retains discretion to exercise supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over pendent state-law claims."); *Carnegie-Mellon*, 484 U.S. at 350 n.7 (Dismissal of state law claims to promote comity "does not establish a mandatory rule to be applied inflexibly in all cases."); *Wright*, 29 F.3d at 1251 (A federal court may retain supplemental jurisdiction over state claims if some procedural bar would prevent their litigation in state court.).

In the federal case, Defendants filed a motion and supporting memorandum urging the district court to decline jurisdiction over the state law claims. Defendants specifically argued to the federal

court that Plaintiffs "would not be unduly prejudiced by the dismissal of [the] state law claims" because they could be refiled in state court. The federal district court granted Defendants' motion and dismissed the state claims without prejudice. *Gaston*, 2008 WL 169814, at *16. The court did so "upon consideration of the arguments presented by counsel" and with the understanding fostered by those arguments that Plaintiffs "will be free to pursue [their] claims in a Kansas court[.]" 2008 WL 169814, at *16.

Plaintiffs appealed the ruling dismissing the constitutional claims against Deputy Roberts on qualified immunity grounds and the order dismissing their state law claims without prejudice. In that appeal, the Tenth Circuit relied heavily on its earlier opinion and found no error in affording Deputy Roberts qualified immunity. *Gaston v. Ploeger*, 297 Fed. Appx. 738, 745 (10th Cir. 2008). In a single paragraph, the Tenth Circuit also affirmed the dismissal of the state claims. 297 Fed. Appx. at 746.

While the Tenth Circuit decided that appeal, Plaintiffs filed this action in Brown County District Court on July 11, 2008, reasserting the state law claims that had been dismissed without prejudice.

## RES JUDICATA

The Brown County District Court granted summary judgment to Defendants based on res judicata, even though they refrained from asserting that affirmative defense in this case. The district court's decision was erroneous in several respects. We reverse that determination. To explain the full extent of the error, we must outline how res judicata operates generally and in Kansas. We must also look at the doctrine of judicial estoppel, which Defendants correctly acknowledge kept them from raising res judicata as a defense.

Because the issue depends upon undisputed circumstances drawn from the procedural history of this case and involves no resolution of disputed facts, it presents a question of law subject to unrestrained review here. See *State v. Duncan*, 291 Kan. 467, 470, 243 P.3d 338 (2010) (When the facts are undisputed, the legal import of a party's actions presents a question of law.); *Chesbro v. Board of Douglas County Comm'rs*, 39 Kan. App. 2d 954, 960, 186

P.3d 829, *rev. denied* 286 Kan. 1176 (2008) (Even what is commonly an issue of fact may be determined as a question of law when the material facts are undisputed.). The Kansas Supreme Court has also recognized that "[t]he applicability of res judicata or collateral estoppel is a question of law, subject to unlimited review." *In re Care & Treatment of Sporn*, 289 Kan. 681, 686, 215 P.3d 615 (2009).

Broadly speaking, res judicata or claim preclusion promotes judicial efficiency and prevents a plaintiff from subjecting a defendant to repeated legal actions arising out of the same factual circumstances. The doctrine, as commonly defined, does so in two ways: (1) A plaintiff may not assert claims against a defendant that the plaintiff could have brought but did not in an earlier suit against the defendant; and (2) after a court has ruled against a plaintiff on the merits of a claim, the plaintiff may not reassert that claim in a second suit against the defendant. 18 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 4402 (2002). In other words, res judicata prohibits a plaintiff from filing a successive suit against a defendant based either on factually related claims omitted from an earlier suit or on claims actually asserted and lost on a final judgment on the merits in the earlier suit. In discussing those two preclusive effects of a judgment, Wright, Miller & Cooper explain: "The first is the effect of foreclosing any litigation of matters that never have been litigated, because of a determination that they should have been advanced in an earlier suit." And "the second is the effect of foreclosing relitigation of matters that have once been litigated and decided." 18 Federal Practice and Procedure: Jurisdiction 2d § 4402, p. 7. See *Pierson Sand v. Keeler Brass*, 460 Mich. 372, 380, 596 N.W.2d 153 (1999) ("[T]he doctrine of res judicata applies, except in special cases, in a subsequent action between the same parties and not only to points upon which the court was actually required by parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time.") (internal quotes omitted).

As a prominent corollary to those res judicata precepts, courts have commonly recognized that claims dismissed without prejudice and, thus, without a ruling on their merits may be reasserted in new litigation. *Mine Workers*, 383 U.S. at 726-27 (The United States Supreme Court recognizes that "if the federal claims are dismissed before trial . . . the state law claims should be dismissed as well . . . . [T]he state claims may be dismissed without prejudice and left for resolution to state tribunals."); *Gold v. Local 7, United Food and Commercial Workers*, 159 F.3d 1307, 1311 (10th Cir. 1998) (When a federal court declines supplemental jurisdiction under 28 U.S.C. § 1367, "[t]he proper course of conduct . . . is to dismiss the state law claims without prejudice, in order to permit them to be brought in state court."). Leading commentators take the same view. 47 Am. Jur. 2d, Judgments, § 548 (Dismissal without prejudice ordinarily indicates "the absence of a decision on the merits, leaving the parties free to litigate the matter in a subsequent action."); 13D Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 3d § 3567.3 pp. 410-11 ("When a court . . . dismiss[es] the state-law claims without prejudice . . . . [t]his course permits the plaintiff to refile in state court."); Restatement (Second) of Judgments § 20 (1981) (A judgment for the defendant does not bar another action by the plaintiff on the same claim when the court directs that the action be dismissed without prejudice.).

More than 20 years ago, the Kansas Supreme Court embraced that well-accepted treatment of a dismissal without prejudice. *Jackson Trak Group, Inc. v. Mid States Port Authority*, 242 Kan. 683, 691, 751 P.2d 122 (1988). The Kansas Supreme Court recognized that "res judicata is held not to apply to issues raised in the previous case which were not decided by the court or the jury." 242 Kan. at 691. The court explained: "[A] judgment is not res judicata as to any matters which a court expressly refused to determine, and which it reserved for future consideration, or which it directed to be litigated in another forum or in another action." 242 Kan. at 691 (citing *American Home Asssur. v. Pacific Indem. Co., Inc.*, 672 F. Supp. 495 [D. Kan. 1987]); 46 Am. Jur. 2d, Judgments § 419, pp. 588-89). Under that authority, including *Jackson Trak*, res judicata would have no application here, since Plaintiffs' state law

claims were dismissed in federal court without being decided on the merits. And everyone anticipated Plaintiffs would file a suit in state court reasserting those claims.

But in *Stanfield v. Osborne Industries, Inc.*, 263 Kan. 388, 949 P.2d 602 (1997), and in *Rhoten v. Dickson*, 290 Kan. 92, 223 P.3d 786 (2010) (affirming *Stanfield*), the Kansas Supreme Court redefined res judicata in a unique and narrow way. Those two decisions hold that res judicata bars a state court action reasserting state claims a federal court has dismissed without prejudice and solely for lack of jurisdiction under 28 U.S.C. § 1367. Even though the federal court never ruled on the merits of the state law claims in that circumstance, the court's dismissal of the federal claims on the merits, thereby removing the basis for federal jurisdiction, is sufficient to prevent any later consideration of the state claims in state court. Those decisions do not mention *Jackson Trak*'s contrary determination of the issue or purport to overrule it. Nor do they discuss the more conventional treatment of res judicata we have outlined that would allow refiling of state claims dismissed in federal court for want of jurisdiction.

Nonetheless, *Stanfield* and *Rhoten* do define the contemporary application of res judicata in Kansas. That definition, however, appears to enlist no other adherents. Comment, *Kansas' Rationale Is Dust In The Wind*, 50 Washburn L.J. 511 (2011) (A detailed analysis of current Kansas res judicata doctrine cites substantial contrary case authority from other jurisdictions but identifies no other jurisdiction recognizing a rule comparable to that set forth in *Stanfield* and *Rhoten*.). And it has the effect of depriving a plaintiff bringing state and federal claims in a federal court action of any forum to adjudicate the state claims if the federal court declines to retain supplemental jurisdiction over them after dismissing only the federal claims on the merits.

Accordingly, res judicata (at least in the way it must be applied in the Kansas state courts) would have barred Plaintiffs from relitigating their state claims *if* the Brown County District Court could have properly considered the doctrine. But the district court could not and should not have injected res judicata into the case. Doing so was plain error.

First, res judicata is an affirmative defense that must be pled in a defendant's answer. K.S.A. 60-208(c). A defendant failing to assert an affirmative defense waives it. *Turon State Bank v. Bozarth,* 235 Kan. 786, Syl. ¶ 1, 684 P.2d 419 (1984); *Coffman v. State,* 31 Kan. App. 2d 61, 67, 59 P.3d 1050 (2002). As we discuss below, Defendants made a deliberate decision—consistent with the doctrine of judicial estoppel—to refrain from arguing a res judicata defense in the Brown County action. Given the absence of Defendants' mention of res judicata in their answer or later in the case, the district court erred in relying on the defense in its ruling granting summary judgment. *Coffman,* 31 Kan. App. 2d at 67 ("[A]ffirmative defenses cannot be raised by the court, and consideration of such defenses constitutes error."); see *Frontier Ditch Co. v. Chief Engineer of Div. of Water Resources,* 237 Kan. 857, 864, 704 P.2d 12 (1985) (The district court improperly raised an affirmative defense on its own initiative—there, a statute of limitations bar—and committed error by doing so.); *Limestone Farms, Inc. v. Deere & Company,* 29 Kan. App. 2d 609, 615, 29 P.3d 457 (2001) (same); see also *ARY Jewelers v. Krigel,* 277 Kan. 27, 38, 82 P.3d 460 (2003) (citing *Frontier Ditch* with favor).

At oral argument, counsel for Defendants confirmed that they deliberately refrained from relying on res judicata given the dictates of judicial estoppel. The omission of the affirmative defense was not an oversight but recognition of an obligation imposed on Defendants as a result of their argument to the federal court for dismissal of the state claims in that forum. Judicial estoppel provides an alternative ground precluding res judicata as a defense in this action.

Judicial estoppel precludes a party from taking one position in a case to induce the court to act in a certain way and then taking a contrary or conflicting position in a related proceeding involving the same opposing parties. *New Hampshire v. Maine,* 532 U.S. 742, 749-51, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001); see *Reed Elsevier, Inc. v. Muchnick,* 559 U.S. 154, 168-70, 130 S. Ct. 1237, 176 L. Ed. 2d 18 (2010) (recognizing and summarizing the doctrine of judicial estoppel as discussed in *New Hampshire*). The United States Supreme Court described the doctrine this way: " '[W]here

a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.' " *New Hampshire*, 532 U.S. at 749 (quoting *Davis v. Wakelee*, 156 U.S. 680, 689, 15 S. Ct. 555, 39 L. Ed. 578 [1895]). Thus, judicial estoppel " 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.' " 532 U.S. at 749 (quoting *Pegram v. Herdrich*, 530 U.S. 221, 227 n.8, 120 S. Ct. 2143, 147 L. Ed. 2d. 164 [2000]). The doctrine operates not only within a single suit; it applies to positions taken in related proceedings. 532 U.S. at 749. A court may apply judicial estoppel in its discretion as necessary to preserve " 'the essential integrity of the judicial process.' " 532 U.S. at 750. That integrity is compromised when a party invites a court to rule a certain way by advancing a particular argument and then allows another court to rule in an inconsistent way in cognate litigation. The doctrine is a flexible one, operating with sufficient suppleness to remedy impermissible manipulations in varied situations. The Kansas appellate courts have recognized and applied judicial estoppel. See *In re Marriage of Hudson*, 39 Kan. App. 2d 417, 425, 182 P.3d 25, *rev. denied* 286 Kan. 1178 (2008).

Judicial estoppel should be applied to prevent the use of res judicata (as retooled in *Stanfield* and *Rhoten*) to bar the litigation of the state law claims arising out of Belden's death. In the federal case, Defendants affirmatively sought dismissal of those claims without prejudice and represented to the federal court that they could then be fully litigated in state court. The federal court exercised its discretion to accede to that request, in part, based on Defendants' representations, though it could have retained the state claims. Defendants plainly understood as much and, consistent with preserving the integrity of the process, declined to plead res judicata in this case after Plaintiffs refiled the state claims in Brown County. But Defendants then stayed silent when the Brown County District Court did precisely what judicial estoppel precluded. The district court acted contrary to the representations

Defendants used to secure dismissal of the federal action by preventing Plaintiffs from litigating their state claims based on the unasserted affirmative defense of res judicata.

At oral argument, counsel for Defendants suggested judicial estoppel should not apply because the Brown County District Court acted on its own to invoke res judicata to dismiss Plaintiffs' state law claims. We fail to see any meaningful difference in a distinction between Defendants improperly asserting res judicata in state court and failing to inform the state court that their earlier position in the litigation precluded them from relying on res judicata as a defense. The integrity of the process seems pretty much equally compromised in either event. Defendants had an obligation to see that the Brown County District Court was fully informed of those circumstances even after the summary judgment ruling, since that was where the court latched onto res judicata.

Plaintiffs did not raise the issue with the district court. But given the posture of the case, they had neither an effective vehicle nor much reason to do so. The trial court imposed res judicata in its summary judgment ruling without prompting or briefing from the parties. Plaintiffs had no opportunity or need to address the issue in their opposition to summary judgment. Because the summary judgment ruling relied on several independent grounds to dismiss Plaintiffs from court, asking for reconsideration on res judicata would have been an academic exercise at best. A plaintiff need not file a motion to alter or amend a judgment under K.S.A. 60-259(f), as a prerequisite to taking an appeal.

The issue presents a question of law, and no gap in the evidence prevents this court from fully considering it. Given that set of circumstances, along with the policies supporting judicial estoppel in this case, there is nothing amiss in appellate review of the point. See *In re Estate of Broderick*, 286 Kan. 1071, 1082, 191 P.3d 284 (2008) (An appellate court may consider an issue first raised on appeal for various reasons including service of "the ends of justice.").

The circumstances here also outline the substantial problems (not to mention likely error) a court stirs up by relying on an affirmative defense no one has presented in a case. There may well be

sound, though latent, reasons for that omission. For example, parties often enter into an agreement between themselves to toll any statute of limitations defense so they may continue presuit negotiations beyond that deadline. If suit is filed, the defendant then refrains from asserting the affirmative defense. The trial court need not be informed of the agreement. But the court ought not then rely on its perception of a statute of limitations defense to grant judgment. The situation here is materially similar. While there was no formal agreement between the parties as to forbearance of a res judicata defense, Defendants were just as constrained by their formal representations to the federal court. It was, therefore, equally inappropriate and detrimental to the judicial process for the Brown County District Court to make uninvited use of res judicata to grant summary judgment to Defendants.

Based on their representations to the federal court to secure dismissal of Plaintiffs' state claims in that forum, Defendants were estopped from advocating for or benefiting from a res judicata defense in this suit. The district court erred in using res judicata as a legal ground to enter summary judgment for Defendants.

## COLLATERAL ESTOPPEL

The Brown County District Court also granted summary judgment to Defendants based on the collateral estoppel effect of facts the Tenth Circuit found in deciding the interlocutory appeal and affording Sheriff Shoemaker and Sgt. Hollister qualified immunity on the federal constitutional claims. We find the district court's ruling to be in error to the extent Defendants' liability on the state law claims is premised on the argument that jail personnel should have known Belden was suicidal or that they otherwise violated facility procedures that might have prevented the suicide. Those theories do not conflict with the Tenth Circuit's factual findings. As with our consideration of res judicata, this issue presents a matter of law.

Collateral estoppel or issue preclusion binds a party to a factual determination made in a case as an integral part of a judgment when the same issue comes up in a successive suit involving the same litigants. *In re Tax Appeal of City of Wichita*, 277 Kan. 487,

506, 86 P.3d 513 (2004); *Hawkinson v. Bennett*, 265 Kan. 564, 589, 962 P.2d 445 (1998) (There must be a prior judgment on the merits between the parties or those in privity with them, and " 'the issue . . . must have been determined and necessary to support the judgment.' ") (quoting *Jackson Trak Group*, 242 Kan. at 690-91). The doctrine furthers substantially the same goals as res judicata in promoting judicial efficiency and preventing unfairness to an opposing party. Collateral estoppel essentially recognizes that once a court has determined a material factual issue, a party may not secure a new determination contrary to that finding in later litigation.

Collateral estoppel is also an affirmative defense. K.S.A. 60-208(c). And Defendants did not plead collateral estoppel in their answer in this case. Ordinarily, that would amount to a waiver. Here, however, Defendants relied on the doctrine in their papers supporting summary judgment. Plaintiffs identified the argument as one based on collateral estoppel and responded on the merits. They did not argue that the affirmative defense had been omitted from Defendants' answer and, therefore, waived. Accordingly, Plaintiffs relinquished that procedural challenge to collateral estoppel and effectively freed the Brown County District Court to apply the defense. See *Herrington v. Pechin*, 198 Kan. 431, 434, 424 P.2d 624 (1967) (When the proponent argues or offers evidence on an affirmative defense without objection from the opposing party that the defense had not been pled, the court may consider the defense.). The rule permitting use of an unpled affirmative defense in the absence of an objection based on its omission from the answer is one of long standing. See *Owner-Operator Indep. Drivers, Inc. v. USIS Commercial Services, Inc.*, 537 F.3d 1184, 1190 (10th Cir. 2008); *Hardin v. Manitowoc-Forsythe Corp.*, 691 F.2d 449, 458 (10th Cir. 1982); *Wagner v. United States*, 573 F.2d 447, 452 (7th Cir. 1978).

Under the circumstances, the district court properly could apply collateral estoppel in this case. In turn, the district court properly could (and did) give effect to the Tenth Circuit's factual finding that neither Sheriff Shoemaker nor any jail personnel had actual knowledge Belden was suicidal. The district court likewise properly could (and did) consider the Tenth Circuit's determination they

acted without deliberate indifference to Belden's situation on August 14, 2002, meaning their conduct fell short of a conscious disregard or blind avoidance tantamount to willfulness. *Leavitt v. Correctional Medical Services, Inc.*, 645 F.3d 484, 497 (1st Cir. 2011) (In discussing deliberate indifference, the court likens the standard to willful blindness: " 'Willful blindness and deliberate indifference are and not mere negligence; these concepts are directed at a form of scienter in which official culpability ignores or turns away from what is otherwise apparent.' ") (quoting *Alsina-Ortiz v. Laboy*, 400 F.3d 77, 82 [1st Cir. 2005]).

But the trial court's decision to credit the factual findings of the Tenth Circuit does not provide a legally sufficient basis to enter judgment for Defendants on the state law claims. Those claims are grounded in negligence. As we discuss more fully later, negligence may be premised on simply failing to take reasonable steps or action consistent with a legal duty. Carelessness is enough. Plaintiffs need not demonstrate the sheriff or the jail employees knew Belden was suicidal to show they were negligent. That would be more than sufficient, but it is unnecessary. To resist summary judgment, they need only point to facts permitting an inference that a reasonable person should have known Belden was suicidal or otherwise in distress or an inference that jail personnel negligently failed to follow established policies or procedures that might have prevented Belden's death.

In sum, the Tenth Circuit's rulings cut off any argument that Sheriff Shoemaker and the jail employees *knew* Belden intended to kill himself. And that lack of actual knowledge required dismissal of the constitutional claims in the Tenth Circuit's analysis. But the state law claims, based on negligence, carry no such requirement of actual knowledge. The legal threshold is set much lower. The Tenth Circuit's factual findings, therefore, do not establish the negligence claims to be legally insufficient. Those findings, credited through collateral estoppel in this case, do not require judgment for Defendants on the negligence claims. The district court erred in so ruling.

Judicial estoppel does not figure into or prevent the application of collateral estoppel, as it does with res judicata. As outlined ear-

lier, Plaintiffs were plainly disadvantaged under the Kansas version of res judicata after their state claims were dismissed in federal court and they were required to file a new action in Brown County—contrary to Defendants' representations to the federal court to induce the dismissal. That's why Defendants properly refrained from asserting res judicata and why judicial estoppel precludes their benefiting from the district court's uninvited reliance on res judicata. But no similar disadvantage befalls Plaintiffs from collateral estoppel. Even if Plaintiffs had remained in federal court to litigate their state claims, they would have been bound by the Tenth Circuit's factual findings. Federal courts apply the doctrine of law of the case to give effect to legal and factual determinations made on appeal when an action is then remanded to the trial level for further proceedings. See *United States v. Pineiro*, 470 F.3d 200, 205 (5th Cir. 2006) (Law of the case "prohibits a district court on remand from reexamining an issue of law or fact previously decided on appeal and not resubmitted to the trial court on remand."); *National Hockey League v. Plymouth Whalers*, 419 F.3d 462, 470 (6th Cir. 2005) (Law of the case binds the parties to an appellate court determination regarding the absence of an "economic market" in an antitrust action.). Plaintiffs would have been bound by the Tenth Circuit's factual findings in state court through collateral estoppel and in federal court through law of the case.

### Legal Duty Owed Inmates

Without elaboration in its memorandum decision, the trial court found "no evidence" Defendants breached a legal duty owed Belden as a pretrial detainee. The court incorporated Defendants' summary judgment arguments in support of that conclusion. The ruling furnished an independent basis to dismiss the claims Plaintiffs have asserted. We find the trial court's ruling to be incorrect as to the actions of jail personnel on August 14. There are disputed material facts that would allow a jury to find their action or inaction to be negligent and a proximate cause of Belden's death. But Plaintiffs have failed to show material factual disputes that could result in tort liability because of the hiring, training, or general supervision of the jail employees. Plaintiffs have likewise failed to show

that the jail's pertinent policies and procedures are themselves deficient or fail to conform to accepted standards for prison facilities. The trial court, therefore, properly granted summary judgment on Plaintiffs' theories based on the hiring, training, or general supervision being substandard and based on the policies and procedures being inadequate.

The standards for weighing summary judgment are well settled. A party seeking summary judgment has the obligation to show, based on appropriate evidentiary materials, there are no disputed issues of material fact and judgment may, therefore, be entered in its favor as a matter of law. *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900, 220 P.3d 333 (2009); *Korytkowski v. City of Ottawa*, 283 Kan. 122, Syl. ¶ 1, 152 P.3d 53 (2007). In essence, the movant argues there is nothing for a jury or a trial judge sitting as factfinder to decide that would make any difference. The party opposing summary judgment must then point to evidence calling into question a material factual representation made in support of the motion. *Shamberg*, 289 Kan. at 900; *Korytkowski*, 283 Kan. 122, Syl. ¶ 1. If the opposing party does so, the motion should be denied so a factfinder may resolve that dispute. In addressing a request for summary judgment, the trial court must view the evidence most favorably to the party opposing the motion and give that party the benefit of every reasonable inference that might be drawn from the evidentiary record. *Shamberg*, 289 Kan. at 900. An appellate court applies the same standards in reviewing the entry of a summary judgment.

To begin at the beginning, actionable negligence requires a duty owed by the defendant to the plaintiff, a breach of that duty, harm to the plaintiff, and a causal connection between the breach and the harm. *Adams v. Board of Sedgwick County Comm'rs*, 289 Kan. 577, 585-86, 214 P.3d 1173 (2009); *Reynolds v. Kansas Dept. of Transportation*, 273 Kan. 261, Syl. ¶ 1, 43 P.3d 799 (2002). A governmental entity—here, Brown County—and its officers and employees may be liable for negligence under the Kansas Tort Claims Act, K.S.A. 75-6101 *et seq.*, subject to various immunities and other limitations.

The existence of a legally enforceable duty presents a question of law. *Adams*, 289 Kan. 577, Syl. ¶ 4. A county maintaining a jail owes a duty of care to the inmates housed there. This court discussed the duty in detail in *Thomas v. Board of Shawnee County Comm'rs*, 40 Kan. App. 2d 946, 951-56, 198 P.3d 182 (2008), *rev. granted* (January 7, 2010). Because review has been granted, *Thomas* may not be cited as controlling legal authority. Supreme Court Rule 8.03(i) (2010 Kan. Ct. R. Annot. 68) (Upon a grant of review, the Court of Appeals opinion "has no force or effect."). But the reasoning of and authority cited in *Thomas* have persuasive value as a studied analysis of the issue in much the same way secondary sources may enlighten or provoke courts in their decisionmaking. In *Thomas*, 40 Kan. App. 2d at 956, the court adopted Restatement (Second) of Torts § 314A (1964) as an appropriate statement of the standard of care a penal facility owes inmates in its custody. We have evaluated the law in this area and come to the same conclusion. An obligation of reasonable care to inmates arises because they are not at liberty to meet their own needs and, thus, must depend upon those who hold them. The authors of Restatement (Second) of Torts § 314A articulate a sound, measured duty appropriate to that legal relationship.

Other Kansas cases recognize a legally enforceable duty of care derived from the special relationship between a place of incarceration or confinement and the person held. *Adams*, 289 Kan. 577, Syl. ¶ 6 (A person having legal custody of an individual holds a special relationship imposing a duty to reasonably control that individual.); *Hesler v. Osawatomie State Hospital*, 266 Kan. 616, 624-25, 971 P.2d 1169 (1999) (citing Restatement [Second] of Torts § 314A regarding special relationships creating duty of care, including taking legal custody of another); *Jackson v. City of Kansas City*, 263 Kan. 143, 156-57, 947 P.2d 31 (1997) (Police officers owed a duty to a handcuffed arrestee to protect him against third parties, as provided in Restatement [Second] of Torts § 320 [1964].); *P.W. v. Kansas Dept. of SRS*, 255 Kan. 827, 833, 877 P.2d 430 (1994); *Washington v. State*, 17 Kan. App. 2d 518, 523-24, 839 P.2d 555, *rev. denied* 252 Kan. 1095 (1992) (A state prison has a duty of reasonable care as outlined in the Restatement [Second] of Torts

§ 320 to protect an inmate from harm at the hands of another inmate.). Notably, those cases look to the Restatement in fashioning the scope of the duty.

The *Jackson* decision is especially instructive in that the Kansas Supreme Court found that after arresting and handcuffing Jackson, two police officers had a duty to protect him from attack by his enraged girlfriend. The officers failed to do so, and she stabbed Jackson. The court specifically cited Restatement (Second) of Torts § 320 as establishing a duty on the part of those taking legal custody of an individual to protect him or her from third persons who reasonably might pose a danger. That section of the Restatement (Second) reflects a specialized application of the more general duty of care owed individuals in legal custody outlined in Restatement (Second) of Torts § 314A. See *Doe Parents No. 1 v. State, Dept. of Educ.*, 100 Hawaii 34, 79, 58 P.3d 545 (2002) (characterizing Restatement [Second] § 320 as "a particularized application of [the] rule" set out in Restatement [Second] § 314A); *Fedie v. Travelodge Intern., Inc.*, 162 Ariz. 263, 265, 782 P.2d 739 (1989) (noting that a special relationship of the type described in Restatement [Second] § 314A triggers the duty to protect against third parties outlined in Restatement [Second] § 320). The legal recognition the Kansas Supreme Court gave Restatement (Second) § 320 depends upon a duty of care owed those in legal custody and, therefore, tacitly accords similar status to the comparable duty outlined in Restatement (Second) § 314A. The Court of Appeals decision in *Washington*, 17 Kan. App. 2d at 523-24, carries the same import. The court applied Restatement (Second) § 320 as defining a duty of care due one inmate in circumstances suggesting he was a likely target for violent retaliation from another inmate.

The Kansas Supreme Court has regularly relied upon the Restatement (Second) of Torts for authoritative guidance in fashioning controlling doctrine on scope of duty, negligence, and related liability issues when a plaintiff alleges a special relationship. *Adams*, 289 Kan. at 593-97; *Hesler*, 266 Kan. at 624 (citing Restatement [Second] of Torts §§ 314A, 316, 319 and 320 [1964]); *Jackson*, 263 Kan. at 156-57 (applying Restatement [Second] § 320); *Boulanger v. Pol*, 258 Kan. 289, 303-08, 900 P.2d 823 (1995) (noting Restate-

ment [Second] §§ 315-20 and applying § 315). The court also frequently draws on the Restatement (Second) in other areas of tort law. See, *e.g.*, *Valadez v. Emmis Communications*, 290 Kan. 472, 477, 229 P.3d 389 (2010); *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 421, 228 P.3d 1048 (2010); *Thomas v. Benchmark Ins. Co.*, 285 Kan. 918, 930-33, 179 P.3d 421 (2008). The considered and continuing reliance the court affords the Restatement (Second) as a sound source for legal principles shaping common-law tort doctrine in Kansas lends considerable support to our conclusion here.

Jails and other penal institutions, therefore, stand in a special relationship with the persons they detain as outlined in with Restatement (Second) of Torts § 314A. And having taken legal custody of those prisoners in a manner that "deprive[s]" them of "normal opportunities for protection," such an institution "is under a duty to . . . take reasonable action to protect them against unreasonable risk of physical harm." Restatement (Second) of Torts § 314A. The Brown County jail (or more exactly its managerial personnel and staff employees) owed Belden that duty of care. As outlined in the Restatement, actionable harm may result from the inmate's own conduct. Restatement (Second) of Torts § 314A comment d. Thus, the duty includes protecting self-destructive inmates from acting on those impulses. Penal facility employees are obligated to intervene if they know or have reason to know an inmate is endangered. Comment f. Their actions need not exceed what "is reasonable under the circumstances." Comment f. This conclusion conforms to the reasoning in *Thomas*, 40 Kan. App. 2d at 956. But we have afforded no precedential weight or value to *Thomas*. In keeping with our duty, we have endeavored to independently review and analyze the issue, and having made our best effort to do so, we independently arrive at the same conclusion as the *Thomas* court.

The duty outlined in Restatement (Second) § 314A strikes a careful balance between the inherent difficulties in operating a penal facility and the recognized public policy in providing a reasonably stable, safe environment for persons confined in those facilities. Under the reasonableness standard, penal institutions are

not guarantors of their charges' safety or wellbeing. Liability is not strictly imposed for harm. At the same time, jails and prisons may not cavalierly dismiss the basic needs of those they hold by denying a reasonable measure of what might be considered decent conditions. A reasonableness standard allows individual facilities a necessary flexibility in adopting procedures and practices to meet their obligations without undue burden or cost. What may be reasonable in the Brown County jail might be substandard in a much larger urban jail or a state prison housing large numbers of convicted violent felons but no pretrial detainees.

The absence of blanket tort immunity for penal institutions in the KTCA indicates a legislative determination that those facilities should be subject to liability for otherwise actionable negligence. And it signals a public policy decision that the constitutional floor precluding intentional and deliberately indifferent mistreatment of prisoners fails to sufficiently serve societal norms and goals—in particular, rehabilitation—expected of this state's penal system. In other words, something more humane and attentive than simply refraining from constitutionally prohibited abuse is required. Had the legislature meant to impose no greater duty or obligation than the constitutional minimum, it would have adopted a specific tort claim exception in K.S.A. 75-6104 immunizing jails and prisons for their treatment of inmates. *Cf.* K.S.A. 75-6104(v) (immunity for "any claim arising from providing a juvenile justice program to juvenile offenders" if the program contracts through the commissioner of juvenile justice). The imposition of tort liability also provides a financial incentive for governmental actors operating jails and prisons to adhere to their duty to reasonably protect inmates from harm. The Restatement standard provides an appropriate calibration of that duty.

Using the reasonableness standard of Restatement (Second) Torts § 314A to define the duty owed prisoners hardly reflects legal pioneering. Numerous jurisdictions have done so over the past 40 years. *Myers v. County of Lake, Ind.*, 30 F.3d 847, 850 (7th Cir. 1994) (construing Indiana law and citing Restatement [Second] § 314A); *Joseph v. State*, 26 P.3d 459, 466 & n.26 (Alaska 2001) (The court notes Alaska's law regarding the duty owed inmates conforms

to "the prevailing view" and cites Restatement (Second) § 314A as reflective of that view.); *Haworth v. State*, 60 Hawaii, 557, 563-64 & n.4, 592 P.2d 820 (1979); *Hildenbrand v. Cox*, 369 N.W.2d 411, 415 (Iowa 1985) (Noting its frequent reliance on the Restatement [Second], the court points to § 314A as instructive on law enforcement officers' "special duty to aid and protect" arrestees.); *Slaven v. Salem*, 386 Mass. 885, 887-88, 438 N.E.2d 348 (1982) (citing Restatement [Second] § 314A and noting "case law from other jurisdictions generally follows the Restatement view"); *Thornton v. City of Flint*, 39 Mich. App. 260, 275, 197 N.W.2d 485 (1972); *Murdock v. City of Keene*, 137 N.H. 70, 72-73, 623 A.2d 755 (1993); *Shea v. Spokane*, 17 Wash. App. 236, 242, 562 P.2d 264 (1977), *aff'd* 90 Wash. 2d 43, 578 P.2d 42 (1978); *Brownelli v. McCaughtry*, 182 Wis. 2d 367, 374-75, 514 N.W.2d 48 (Wis. App. 1994); see also *City of Belen v. Harrell*, 93 N.M. 601, 603, 603 P.2d 711 (1979) (Without citing the Restatement, the court recognizes: "[I]n the case of a jailed prisoner, the custodian has the duty to exercise reasonable and ordinary care for the protection of the life and health of the person in custody."); *Gregoire v. City of Oak Harbor*, 170 Wash. 2d 628, 635, 244 P.3d 924 (2010) (Citing case authority from 1918 rather than the Restatement, the Washington Supreme Court notes that state's "courts have long recognized a jailor's special relationship with inmates, particularly the duty to ensure health, welfare, and safety.").

Those cases do not suggest standards or duties distinguishing between pretrial detainees and those convicted of crimes. See *Bell v. Wolfish*, 441 U.S. 520, 537-40, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979) (Consistent with the United States Constitution, pretrial detainees may be subject to sweeping "regulatory restraints" necessary to "maintain security and order" at the facility.). Nor do we. Nonetheless, inmates awaiting trial have been incarcerated not for punitive or rehabilitative purposes at all but because they have been unable to post bond to secure their release while the criminal justice process moves toward a resolution of the charges against them. 441 U.S. at 538-39 (Pretrial detainees may not be subjected to conditions imposed for punitive purposes in contrast to restrictions on liberty incidental to "some other legitimate governmental

purpose," such as the safe operation of a penal facility.). They present a compelling constituency for reasonableness in measuring the legal duty of care penal institutions should extend to inmates.

## DUTY CONSIDERED IN THIS CASE

Having set forth the legal duty owed Belden as a detainee in the Brown County jail, we now look at Defendants' conduct in satisfying that duty. Our analysis takes the facts in a light most favorable to Plaintiffs, since we are reviewing the district court's entry of summary judgment for Defendants.

### Legal Considerations

The contours of a duty, especially one shaped by reasonableness, must be cast to the particular circumstances of the case. But various considerations may inform that determination. *Madison ex rel. v. Babcock Center, Inc.,* 371 S.C. 123, 140, 638 S.E.2d 650 (2006) ("The standard of care in a given case may be established and defined by the common law, statutes, administrative regulations, industry standards, or a defendant's own policies and guidelines."). In some instances, there may be applicable statutes or regulations establishing a duty of care. Thus, in a motor vehicle collision case, running a stop sign amounts to a breach of duty or negligence. PIK Civ. (4th) 121.01, 121.09. Common practices or standards within an industry often bear on the scope of a duty owed. *Pullen v. West,* 278 Kan. 183, 204-05, 92 P.3d 584 (2004). And an entity's own policies and procedures help measure compliance with a duty. See K.S.A. 75-6104(d) (A governmental entity's policies protecting a person's health or safety do not create a legal duty to that person, but the failure to follow such a policy may be considered in determining if the entity has been negligent with regard to an independent legal duty.); *Jarboe v. Board of Sedgwick County Comm'rs,* 262 Kan. 615, 626-28, 938 P.2d 1293 (1997) (construing K.S.A. 75-6104[d]). Neither industry standards nor entity-specific practices are generally treated as conclusive in establishing a "reasonable" duty. They are, however, instructive. *Madison,* 371 S.C. at 140-41 (cases cited). The KTCA so provides. K.S.A. 75-6104(d).

Whether a duty has been breached presents a question of fact and, therefore, typically is unsuited for summary disposition rather than submission to a jury. *Calwell v. Hassan*, 260 Kan. 769, Syl. ¶ 3, 925 P.2d 422 (1996); *Honeycutt v. City of Wichita*, 251 Kan. 451, 452, Syl. ¶ 8, 836 P.2d 1128 (1992). Causation—the connection between the breach and the injury—similarly is a question of fact usually reserved for the jury. *Calwell*, 260 Kan. 769, Syl. ¶ 3; *St. Clair v. Denny*, 245 Kan. 414, 417, 781 P.2d 1043 (1989). Should the evidence taken in the best light for a plaintiff nonetheless fail to establish a basis for a jury to return a verdict for that plaintiff, the court may enter a summary judgment for the defendant. See *St. Clair*, 245 Kan. at 417; *Lay v. Kansas Dept. of Transportation*, 23 Kan. App. 2d 211, 215, 928 P.2d 920 (1996), *rev. denied* 261 Kan. 1085 (1997). In negligence cases, that should be the exception. *Lay*, 23 Kan. App. 2d at 215 ("Usually, a determination of the presence or absence of negligence should be left to the trier of fact.").

*Factual Considerations*

Examining the factual record in light of those principles establishing the duty owed and the relaxed standard of review governing summary judgment, we ask whether, giving Plaintiffs the benefit of every disputed fact and every plausible inference, a reasonable jury *might* render a verdict for them. We do not consider the probability of such a verdict, only its possibility. And we neither venture some prediction on that score nor suggest the parties try to divine one from our discussion.

Several facts bear highlighting in a review of the record:

● The jail had a policy that inmates could not obscure the windows to their cells. The purpose behind the policy seems self-evident. Jail personnel cannot see what the inmates are up to if the windows are covered. An inmate wishing to avoid that observation may be undertaking something dangerous, nefarious, or even self-destructive. In his deposition, Sgt. Hollister testified an obstruction of a cell window should be removed "as soon as possible" although doing so requires two officers for safety reasons.

- The jail had a policy that the general inmate population was to be observed once an hour. The jail, also by policy, maintained Cell 14 for persons in need of observation every 15 minutes. Persons at immediate risk of harm were to be placed there. That group included detainees displaying suicidal behaviors, recent arrestees under the influence of drugs or alcohol, and those with other potentially acute medical problems.

- In the 5 years before Belden's death, between 75 and 100 inmates at the Brown County jail had either attempted suicide or engaged in behavior indicating to jailers a serious risk of suicide. That is an average of one such incident every 2½ to 3½ weeks.

- About 6:40 p.m. on August 14, Sgt. Hollister told Deputy Roberts to get another officer and move Belden to Cell 14. Sgt. Hollister apparently did not tell Deputy Roberts why Belden need to be moved. Deputy Roberts called Sgt. Hollister at home because Belden had papered over the window of his cell. Shortly after 8 p.m., with the assistance of an inmate trusty, Deputy Roberts attempted to enter Belden's cell and found Belden hanged from the door with a bed sheet around his neck.

*Deputy Roberts*

From the record evidence, including those circumstances, a jury reasonably could conclude Deputy Roberts was negligent and that negligence played a causative role in Belden's death. We outline what a jury might infer. Once Belden papered the window to his cell and refused to move the obstruction, Deputy Roberts should have suspected and did suspect something was afoot or amiss with Belden. He was concerned enough to disturb Sgt. Hollister, the jail administrator, at home to get some guidance. A jury could find that Sgt. Hollister's directive to move Belden to Cell 14 also should have alerted Deputy Roberts to a significant problem requiring immediate attention.

While Sgt. Hollister did not explicitly state why Belden was to be placed in Cell 14, the only applicable criterion would have been the potential for suicidal behavior. Belden neither was intoxicated nor had some medical condition requiring close monitoring. At that point, Deputy Roberts could have inferred Sgt. Hollister, at least,

considered Belden a danger to himself. Moreover, suicidal behavior among the inmate population was far from unusual or extraordinary. Based on the frequency of those incidents, jailers reasonably could be expected to view attempted suicide by an inmate as an ever present possibility rather than an occurrence so rare as to be discounted as wholly improbable.

A jury could find that Deputy Roberts should have considered Belden a suicide risk after talking with Sgt. Hollister. That would be true even if Deputy Roberts had not come to that conclusion based on his own observations. Just as important in analyzing any breach of duty, Deputy Roberts should have acted far more aggressively in carrying out Sgt. Hollister's directive to get Belden into Cell 14, whatever the reason. Sgt. Hollister wanted Belden in a place where the jailers could actually see what he was doing and where he would be directly monitored every 15 minutes. Deputy Roberts, however, did little or nothing to accomplish that objective.

Deputy Roberts says he talked to the dispatcher about getting another officer to the jail so they could enter Belden's cell and move him. But the jail log reflects no such communication. A jury could infer Deputy Roberts never contacted the dispatcher. And, even if he had, he did nothing to follow up when nobody arrived to help. Deputy Roberts waited more than an hour and a half to enlist an inmate trusty to enter the cell holding Belden.

In the meantime, Deputy Roberts should have begun monitoring Belden as if he had been placed in Cell 14—that is, every 15 minutes. While Deputy Roberts could not have visually monitored Belden, he could have spoken to him that often. The record evidence indicates Deputy Roberts' contact with Belden between 6:30 and 8:15 p.m. was at best limited and sporadic. It plainly was less intensive than the policy requiring monitoring every 15 minutes for an inmate in Cell 14.

Those circumstances sketch a picture from which a jury could find a breach of the duty of care owed Belden. The duty itself is one of reasonableness to prevent an unreasonable risk of physical harm, including self-inflicted harm. Through its policies, the Brown County jail had determined that placing inmates at risk for suicide in a specific, controlled location (Cell 14) and monitoring

their status frequently and regularly (every 15 minutes) satisfied that legal duty. The policy plainly aimed to protect the health and safety of inmates. In turn, under the KTCA, government entities and their employees may not claim immunity based on the enforcement or the failure to enforce policies with health and safety purposes when they owe an independent legal duty to the person harmed. K.S.A. 75-6104(d). Here, of course, the Brown County Sheriff's Department and its employees owed that sort of duty to Belden, as an inmate. Moreover, the failure to conform to an internal policy intended to protect the health and safety of identifiable individuals is itself evidence of negligence or breach of that duty. K.S.A. 75-6104(d). In short, that section of the KTCA precludes using an internal policy to *establish* a duty of care but permits a jury to consider violation of a policy in determining negligence. A jury finding of negligence similarly would draw support from the concomitant failure to remove the obstruction from the cell window. Again, that failure represented a violation of a jail procedure adopted, at least in part, to fulfill the duty to avoid harm to the inmates.

More broadly, a jury could find that jail personnel generally should have known Belden had become potentially suicidal. In the days before Belden died, his fellow inmates saw him pacing and clenching his fists at times and sitting, rocking, and crying at other times. In their briefing, the parties do not provide us with much information about the frequency of that apparently aberrant conduct—it both marked a change in Belden's affect and reflected activity that would seem to indicate significant agitation—and the record on appeal isn't especially illuminating. From what is available, a jury could infer that jail personnel should have seen Belden exhibiting those troubling behaviors had they been effectively monitoring the inmates on an hourly basis consistent with policy. At least one of Belden's cellmates in the week or so leading up to the suicide later told the KBI the rocking and crying had become quite frequent. In turn, a jury could find that those observations, had they been made, should have triggered closer monitoring, perhaps in Cell 14, or actual intervention. At the very least, Deputy Roberts could have been informed that he should have been especially at-

tentive to Belden's conduct on August 14. He then might have been more dutiful in actively intervening when Belden first covered his cell window.

In sum, a jury could find that Deputy Roberts breached a duty of care he, as a jail employee, owed to Belden and the other inmates. Again, we offer no intimation as to what we surmise a reasonable jury should or would conclude. As appellate judges, we are in no position to make the finely tuned credibility determinations 12 jurors come to after seeing witnesses on the stand and studying the full range of evidence. Ours is a legal determination that the evidence in the record would be at least minimally sufficient to support a finding of negligence as to Deputy Roberts.

The issue of causation as to Deputy Roberts' action and inaction also must be left for the jury on the factual record presented here. We have little hesitation in concluding that the evidence could support a jury finding of a causal link between the breach of duty and the ultimate harm. Had Belden been moved to Cell 14 promptly after Sgt. Hollister and Deputy Roberts spoke, a jury could infer that he would have been monitored every 15 minutes, which, in all likelihood, would have kept him from successfully hanging himself. The record supports the inference that Cell 14 had been stripped of accouterments, such as bed sheets, that would facilitate self-destructive behavior. Deputy Roberts indicated in his deposition testimony that the jailers "would take all [Belden's] stuff" before placing him in Cell 14, where there was only a mattress. Even if that were not the case, a jury could conclude that had Belden been watched every 15 minutes he would not have had time to kill himself in that manner. A jury could find the same would have been true had the paper been removed from Belden's cell window and had he then been watched there every 15 minutes. The call was not one for the district court to make on a summary judgment record, but one for a jury based on a full airing of the evidence at trial.

*Sgt. Hollister*

A jury could find from the evidence that Sgt. Hollister breached the duty of care jail employees owed Belden. The evidence sup-

ports a finding that Sgt. Hollister wanted Belden moved to Cell 14 based on what he told Deputy Roberts during their telephone conversation about 6:40 p.m. on August 14. Sgt. Hollister apparently did not say why, and, in his deposition testimony later, he disclaimed any belief that Belden had become potentially self-destructive. But a jury would act within its prerogative to discount the deposition testimony and draw a contrary conclusion from the circumstantial evidence of what Sgt. Hollister said and wrote on August 14. Sgt. Hollister's contemporaneous report states he directed Deputy Roberts to get another officer, "remove all items from [Belden], and move Belden to cell 14 for further observation." The removal of personal property from Belden, such as shoe laces, and heightened monitoring in Cell 14 would be consistent with a standard suicide watch. In the report, Sgt. Hollister did not suggest moving Belden to Cell 14 amounted to discipline. That would have been contrary to policy, at least as presented in the summary judgment record, since jailers did not use placement in Cell 14 as a punitive measure. Rather, Sgt. Hollister wanted Belden watched closely.

A jury could conclude that Sgt. Hollister was insufficiently emphatic and explicit in giving direction to Deputy Roberts in a situation infused with that recurring possibility of a self-destructive inmate. In other words, Sgt. Hollister should have given Deputy Roberts a direct order—in those words—to get Belden out of the situation in which he had placed himself. Sgt. Hollister testified at his deposition that he wanted the paper off the window and Belden in Cell 14 "as soon as possible," and he presumed it would have been done faster. But Sgt. Hollister was communicating with a jailer lacking formal training and who apparently did not sense much urgency in accomplishing the task. Deputy Roberts may or may not have tried to get another officer to the jail; the evidence is equivocal. He did wait about 90 minutes to enter Belden's cell and, then, with the help of an inmate trusty rather than another officer. As we have noted, during that time, Deputy Roberts did not monitor Belden in the rigorous way required for inmates considered sufficiently at risk to be placed in Cell 14. Sgt. Hollister

apparently made no effort to follow up with Deputy Roberts to make sure Belden had been taken care of.

From the evidence, a jury might find that Sgt. Hollister considered Belden to be substantially at risk, but he inadequately conveyed to Deputy Roberts the seriousness of the situation and the need for prompt action. A ranking officer in that instance reasonably should have given a clear order as to what was to be done and some similarly explicit direction that the order be carried out promptly and that any deviation or delay be immediately reported. Whether Sgt. Hollister breached the legal duty we have outlined should be for a jury to determine. Causation presents a jury question, as well. A jury could reasonably conclude that given a direct, unequivocal order, Deputy Roberts would have been more aggressive in securing help in a timely fashion and moving Belden to Cell 14.

Sufficient evidence establishes issues for a jury to decide regarding liability based on the conduct of Sgt. Hollister and Deputy Roberts during the evening of August 14. Those issues arise from how the officers addressed the specific incident involving Belden.

*Sheriff Shoemaker*

Nothing in the record evidence indicates Sheriff Shoemaker had any direct contact with Belden on August 14 or the days leading up to his suicide. Accordingly, Sheriff Shoemaker did not breach a duty owed Belden in that manner.

But Plaintiffs contend Sheriff Shoemaker failed to fulfill the duty owed inmates of the Brown County jail by negligently hiring, training, and supervising the facility's employees and by implementing inadequate policies and procedures for the factility's operation. We look at those theories of liability. They impose direct liability on an employer or policymaker rather than vicarious liability for the misconduct of an underling. *Marquis v. State Farm Fire & Cas. Co.*, 265 Kan. 317, 334-35, 961 P.2d 1213 (1998).

Negligent hiring and retention derive from the same sort of employer conduct: either hiring an individual knowing he or she has characteristics that present an "undue risk" of harm to others given the nature of the job duties or retaining such an individual after

learning of such characteristics. *Schmidt v. HTG, Inc.*, 265 Kan. 372, Syl. ¶¶ 9, 10, 961 P.2d 677 (1998); *Wayman v. Accor North America, Inc.*, 45 Kan. App. 2d 526, 539-40, 251 P.3d 640 (2011). A company that hires or keeps on a traveling sales representative after learning the person has a string of convictions for driving under the influence presents a textbook example of negligent hiring or retention when the driver gets loaded at lunch and then plows into a car while on company business. See *Lincoln v. Fairfield-Nobel Co.*, 76 Mich. App. 514, 518-19, 257 N.W.2d 148 (1977). Plaintiffs offer no evidence that Deputy Roberts or any other jail employees had characteristics that rendered them unfit for the positions they held or the duties they were to perform. The trial court properly entered summary judgment on that theory.

Negligent supervision entails either inadequate oversight and review of an employee in the performance of his or her job duties or failing to control an employee with propensities that might pose a danger. *Marquis*, 265 Kan. at 331, *Wayman*, 45 Kan. App. 2d at 542. Again, Plaintiffs offer no facts to show Sheriff Shoemaker was deficient in his supervision of Deputy Roberts or other jail employees or that any of the employees had "propensities" that posed a risk to Belden or the other inmates. As we have noted, Sgt. Hollister was arguably lax in directing and dealing with Deputy Roberts during the evening hours of August 14 leading up to Belden's suicide. But that laxity does not translate into a claim of direct liability against Sheriff Shoemaker. Summary judgment was properly entered for Sheriff Shoemaker.

A claim based on negligent training depends upon establishing facts showing that more or better training would have prevented the harm. While the record shows Deputy Roberts received what might be termed on-the-job training as a jailer and little or no formal instruction in a classroom setting, Plaintiffs have not demontrated that such schooling would have made any difference in this case. Deputy Roberts was fully aware of the jail policies and procedures for monitoring inmates and for removing obstructions from cell windows. He didn't necessarily need more training on those practices. As we discuss below, Plaintiffs have provided no

meaningful evidence suggesting those policies or practices were legally insufficient in some way.

Plaintiffs suggest had Deputy Roberts received training in detecting potentially suicidal inmates, events might have unfolded and ended differently on August 14. There is some evidence that jail personnel generally should have seen Belden behaving unusually in his cell—the rocking and crying and the pacing—if the inmates were being visually monitored on an hourly basis. But nothing suggests Deputy Roberts saw anything of that nature on August 14 after Belden had been moved to the single cell. And Deputy Roberts interpreted Belden's conduct that evening as defiant rather than suicidal. Nonetheless, Sgt. Hollister had directed Deputy Roberts to move Belden to Cell 14, where the jail placed potentially suicidal inmates. Even if we suppose more or better training would have caused Deputy Roberts to conclude Belden were a risk to himself, the result would have been the same. Belden should have been placed in Cell 14 and subject to monitoring every 15 minutes. It was the failure to monitor Belden in that manner, whether in Cell 14 or where he was, that creates a jury question on liability here, not Deputy Roberts' lack of training. In other words, Plaintiffs have failed to show even disputed facts suggesting a causative connection between Deputy Roberts' lack of training and Belden's death. Summary judgment was appropriately entered on Plaintiffs' inadequate training theory.

Plaintiffs contend the policies and procedures in the Brown County jail were so inadequate as to constitute negligence. But they offer no material evidence to bolster their bare claim to that effect. In the summary judgment papers, they provide an affidavit from Victor D. Lofgreen, who they proffer as an expert in jail operations. At least on appeal, Defendants do not challenge Lofgreen's qualifications to provide expert testimony. We accept him as an expert in that subject matter. As we have noted, policies and procedures falling below accepted practices in an industry or otherwise failing to conform to standards of reasonable care may create tort liability. See *Dye v. WMC, Inc.*, 38 Kan. App. 2d 655, 663-64, 172 P.3d 49 (2007) (An entity may be liable for retaining an

independent contractor knowing of the contractor's substandard procedures.).

Plaintiffs, however, offer no evidence that the Brown County jail's policies and procedures for monitoring inmates were substandard. They turn to Lofgreen on that score. The problems with his opinions are two-fold. Many of them are couched solely in terms of legal standards. Lofgreen repeatedly offers his opinion that various aspects of the jail operations reflected "negligence" and "deliberate indifference" to the rights and needs of Belden. Other opinions are simply conclusory; they lack specificity and foundation tied to factually identifiable deficiencies in the policies or deviations from accepted penal practices. The opinions cite neither accepted "industry" practices nor other standards as a measure for the adequacy of the practices at the jail. The closest Lofgreen comes is a statement that "the manner" in which Defendants "incarcerated inmate Jeffrey Ray Belden were [sic] inconsistent with accepted corrections practices" and amounted to negligence resulting in Belden's death. But Lofgreen details no such practices. Some of the opinions fall short on both counts. Those problems present insurmountable barriers to this court's consideration of the opinions to stave off summary judgment.

While an expert may offer an opinion on ultimate issues in a case, K.S.A. 60-456(d), he or she cannot properly provide legal conclusions. See *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 444-45, 228 P.3d 1048 (2010) ("[I]t is generally recognized that testimony expressing a legal conclusion should ordinarily be excluded . . . ."). Expert testimony in that form invades the province of the court to discern the governing law and to instruct the jury accordingly. 290 Kan. at 444-45. Lofgreen's affidavit seems to trade in almost nothing but legal conclusions by couching his opinions in terms of negligence and deliberate indifference. 290 Kan. at 445 (A witness may not express opinions in terms of "the legal standard of care."). In *Puckett*, the Kansas Supreme Court discussed the prohibition of expert opinion cast in terms of legal standards in the context of juror confusion during a trial. But the rule applies equally to opinions in affidavits filed in support of or in opposition to summary judgment. See K.S.A. 60-256(e) (Affi-

davits must set forth evidence in a form that would be admissible at trial.). It would be both contrary to K.S.A. 60-256(e) and nonsensical to suggest an affidavit could be used to defeat summary judgment by presenting opinion evidence that would be inadmissible in the trial of the case.

In addition, and perhaps more significantly, Lofgreen fails to tie his opinions to shortcomings in particular jail policies or procedures. He notes the evidence shows that Belden was not monitored as often as he should have been, but he never says the procedure calling for observation of an inmate in Cell 14 every 15 minutes is somehow deficient. Lofgreen never indicates there is some conventional monitoring period for inmates considered at risk, reflecting an accepted standard among penologists or prison administrators. Nor does Lofgreen say any other particular policy in effect at the Brown County jail was substandard in that way. As a result, his opinions lack an essential factual foundation. See *Kuxhausen v. Tillman Partners*, 40 Kan. App. 2d 930, 944, 197 P.3d 859 (2008) (Expert opinion testimony must be grounded in more than speculation or unsupported assumption.). There is nothing so obviously wrong with or deficient in the Brown County jail policies and practices that we could suggest a jury reasonably might find them to be negligent simply by reading them and considering their application to these circumstances, even with a generous dollop of common sense. *Hopkins v. State*, 237 Kan. 601, Syl. ¶ 9, 702 P.2d 311 (1985); see *Puckett*, 290 Kan. at 435-36 (A jury may infer neither the appropriate standard of care nor a causal connection to the claimed injury if they would not be "apparent to an average layperson [based on] common knowledge or experience."); *Pullen*, 278 Kan. at 204-05 (noting jury likely lacks common knowledge or experience to discern industry standards or practices pertaining to commercial fireworks shows).

Accordingly, the trial court properly granted summary judgment to Sheriff Shoemaker with regard to the policies and procedures of the jail.

*Brown County Commissioners*

Plaintiffs have sued Warren Ploeger, Glen Leitch, and Steve Roberts as the Brown County Commissioners holding office at the time of Belden's suicide and make substantially the same claims against them as against Sheriff Shoemaker. Based on the factual record developed in the district court and submitted on appeal, the county commissioners are entitled to summary judgment for the same reasons as Sheriff Shoemaker.

In addition, the commissioners are entitled to summary judgment because they are not legally responsible for the hiring or training of personnel or promulgation of policies or procedures within the Brown County Sheriff's Department, particularly with regard to jail operations. In *Board of Lincoln County Comm'rs v. Nielander,* 275 Kan. 257, 261-62, 62 P.3d 247 (2003), the Kansas Supreme Court noted that an elected county sheriff "is not a subordinate of" the elected board of county commissioners but functions with a comparable grant of authority from the legislature. In turn, the county commissioners are "not free to usurp the powers of the office of sheriff by controlling the hiring or firing of the deputies and assistants appointed by the sheriff." 275 Kan. at 262. That ruling reflects the statutory mandate of K.S.A. 19-805(a) giving county sheriffs hiring and firing authority within their departments subject only to personnel policies county commissions may adopt as applicable to all county employees other than elected officials, K.S.A. 19-805(d). County commissioners have no authority and, hence, no legal duty to control hiring and firing decisions of elected sheriffs within their departments. Commissioners cannot be personally liable for breach of a nonexistent duty.

The Kansas Legislature has similarly given sheriffs—not county commissions—statutory authority to operate jails. K.S.A. 19-811 ("The sheriff shall have the charge and custody of the jail of his county . . . ."); K.S.A. 19-1903 ("The sheriff of the county . . . shall keep the jail, and shall be responsible for the manner in which the same is kept."). The United States District Court for the District of Kansas recognized: "Under Kansas statutes, the county sheriff is clearly responsible for keeping the county jail." *Woodson v. Sully,*

801 F. Supp. 466, 468 (D. Kan. 1992). Those statutes confer exclusive authority on a county sheriff to establish policies and procedures for operating a jail. And, in turn, the county commissioners may not require particular operational practices in a jail. Absent such authority, individual county commissioners cannot be held legally liable for the deleterious consequences of substandard jail policies, procedures, or practices.

## Issues the District Court Treated as Moot

In its decision on Defendants' summary judgment motion, the district court declined to rule on disputes over immunities under the KTCA, K.S.A. 75-6104, Brown County's vicarious liability, and application of the statute of limitations. The district court treated those matters as moot because it granted summary judgment on other grounds to all Defendants on all claims. The issues, however, were developed in the summary judgment papers submitted to the district court. Given our determination that Plaintiffs have presented viable claims, those issues are no longer dormant.

An appellate court may consider issues a district court has declined to review as moot in several circumstances. If the appellate court rejects the trial court's reasons for a dispositive ruling, in whole or in part, those "moot" issues could provide an alternative basis to uphold the judgment. Thus, an appellate court may look at them because it will commonly affirm a lower court that has reached the correct result despite relying on an incorrect reason. See *In re Conservatorship of Marcotte*, 243 Kan. 190, 196, 756 P.2d 1091 (1988) (An appellate court may consider an issue raised for the first time on appeal if it may uphold a lower court judgment otherwise based on an insufficient ground.); *Vencor Hospitals v. Blue Cross Blue Shield*, 169 F.3d 677, 682 n.12 (11th Cir. 1999) (An appellate court may consider issue argued below although not relied upon by district court in deciding a case.). Such consideration may be particularly appropriate on summary judgment because the facts are undisputed (they must be viewed in favor of the nonmoving party) and the determination to grant or deny the motion presents a question of law. An appellate court has a vantage point equal to that of the district court when it comes to questions

of law. Here, as noted, the parties briefed the moot issues in their summary judgment papers. See *Box v. A & P Tea Co.*, 772 F.2d 1372, 1376 (7th Cir. 1985) (An appellate court may affirm on any ground found in the trial record so long as the parties have had the opportunity to address that ground.). Finally, an appellate court may act in the name of judicial efficiency to reach issues in that posture rather than remanding for initial disposition below— thereby inviting another round of appellate briefing and delay. *Bush v. Strain*, 513 F.3d 492, 500 (5th Cir. 2008) (The court of appeals recognizes that "[s]ince we could affirm summary judgment on this alternative ground if it had merit, we find it prudent to address this argument now in the interest of judicial efficiency." On review, the appellate court found the alternative ground to be without merit and reversed the summary judgment.).

This is one of those exceedingly rare cases. We cannot overstate that rarity. But the lapse of time has been extraordinary. Belden died 9 years ago, and the litigation of his death has worn on for 7 years. Remanding the issues for further consideration can only cause additional and possibly significant delay. As it is, witnesses may be difficult to find. And time almost inevitably has dulled their recollections. More delay will only aggravate those problems. Were the litigation on its first appeal, we would be far less concerned. But this is the third visit to an appellate court, counting the trips to the United States Court of Appeals.

As we have noted, the issues the district court declined to consider present questions of law at the summary judgment stage. We review those issues and decide them for purposes of summary judgment, thereby clearing the way for proceedings on remand that typically follow resolution of a dispositive motion. As with many such issues, however, the district court may consider them anew in light of the evidence admitted at trial, especially if that evidence differs materially from the summary judgment record.

*KTCA Immunities*

Defendants assert they may not be held to answer for Belden's death based on two immunities extended governmental entities and their employees under the KTCA. They seek shelter in the

discretionary function immunity and the police protection immunity. K.S.A. 75-6104(e), (n). Neither helps them.

The general precepts governing application of the KTCA have been often recited, though the specific implications of many of the immunities outlined in K.S.A.75-6104 remain unsettled. Under the KTCA, liability is the rule, and the exceptions granting immunity are to be narrowly construed. *Kansas State Bank & Tr. Co. v. Specialized Transportation Services, Inc.*, 249 Kan. 348, 364, 819 P.2d 587 (1991) ("The KTCA is an open-ended act, making governmental liability the rule and immunity the exception."); *Jackson v. City of Kansas City*, 235 Kan. 278, 286, 680 P.2d 877 (1984) (KTCA creates a "general rule of governmental liability" subject to exceptions that are to be given a "strict or narrow interpretation."); see *Dougan v. Rossville Drainage Dist.*, 243 Kan. 315, 318, 757 P.2d 272 (1988). The government actor seeking protection through an exception must establish the basis for such relief from liability. *Woodruff v. City of Ottawa*, 263 Kan. 557, 562-63, 951 P.2d 953 (1997); *Jackson*, 235 Kan. at 286.

In K.S.A.75-6104, the KTCA sets forth a lengthy, nonexclusive list of immunities to the general rule of governmental liability for tortious conduct. The police protection immunity states that a public entity or its employees "shall not be liable for damages resulting from failure to provide, or the method of providing, police or fire protection." K.S.A. 75-6104(n). That section codifies the common-law principle of government immunity known as the public duty doctrine. *Hopkins*, 237 Kan. at 609-10 (Various immunities in K.S.A. 75-6104, including that for police and fire protection, codify preexisting common-law doctrine.); see *Robertson v. City of Topeka*, 231 Kan. 358, 363, 644 P.2d 458 (1982). Under that doctrine, governmental entities could not be liable for breach of duties owed the general public as opposed to particular individuals. 231 Kan. at 363 ("[T]he duty of a law enforcement officer to preserve the peace is owed to the public at large, not a particular individual."); *Potts v. Board of Leavenworth County Comm'rs*, 39 Kan. App. 2d 71, 80-81, 176 P.3d 988 (2008) (outlining scope of public duty doctrine). Because municipalities provide police protection to the public at large, they could not be sued for the negligent delivery

of that service in a particular instance. *Roberts*, 231 Kan. at 363 ("Absent some special relationship with or specific duty owed an individual, liability will not lie for damages."); *Potts*, 39 Kan. App. 2d at 81. For example, a city could not be successfully sued because police officers were inexcusably slow in responding to a call of a home invasion in progress and, as a result, the victim suffered prolonged abuse and serious injuries at the hands of the criminals.

Here, the KTCA immunity modeled on the public duty doctrine does not apply. The duty owed Belden derived not from his status as a member of the general public but from his status as a detainee in the Brown County jail. As a detainee, Belden occupied a special and legally protected relationship with the keepers of the jail. It is that relationship that imposes the legal duty at issue here. And K.S.A. 75-6104(n) affords no immunity for a breach of that particularized duty. None of the defendants may avoid liability on that basis.

On summary judgment, Defendants claimed immunity based on the performance of discretionary functions. K.S.A. 75-6104(e). The immunity protects government entities and their employees when they undertake decisionmaking requiring the exercise of discretion, even if that discretion may be abused in the process. K.S.A. 75-6104(e). The protection is not confined to decisions made at an executive level or made by elected officials and may encompass some choices made by nonsupervisory personnel. K.S.A. 75-6104(e); *Woodruff*, 263 Kan. at 562-63 (Tactical decisions of police officers acting in the field may constitute immunized discretionary functions.).

Discretionary function immunity under the KTCA comes into play when a government actor makes a choice among policy options in addressing a given set of circumstances. *Kansas State Bank & Tr. Co.*, 249 Kan. at 365 ("[A] discretionary function must involve some element of policy formulation."). But discretionary function immunity does not protect a decision simply because it entails a selection between taking an action and refusing to take that action. If that were true, discretionary function immunity would eliminate governmental tort liability, since virtually every decision to act or to refrain from acting involves some degree of choice. 249 Kan. at

365. ("[T]he mere exercise of some judgment cannot be the test for a discretionary function because judgment is exercised in almost every human endeavor.") (internal quote omitted). Rather, the decision must reflect something more—a course of conduct grounded in legitimate options requiring an exercise of reasonable judgment to select one option over the others. *Hesler v. Osawatomie State Hospital*, 266 Kan. 616, 633, 971 P.2d 1169 (1999).

Brown County's reliance on discretionary function immunity falls short both legally and factually. Given the way the case sits now, no decisionmaking of the type even arguably immunized remains at issue. We have affirmed the summary judgment for Defendants on the negligence claims arising from the policies and procedures in place at the jail or on the absence of some different (and presumably better) operational practices. Likewise, we have upheld the summary judgment dismissing the hiring, retention, training, and supervision claims that arguably might include immunized discretionary components. We have done so in the absence of any disputed facts that would support a jury verdict on those claims. As a result, there is nothing left to immunize.

The remaining claims on which we reverse do not even arguably implicate protected discretionary functions in light of the summary judgment record and the required review deferential to Plaintiffs' claims. Deputy Roberts' actions and inactions on August 14 entail no discerning choices among reasonable alternative courses of action. His conduct would not come within the scope of that immunity. And Sgt. Hollister essentially failed to give Deputy Roberts a clear order or otherwise provide sufficient direction to him on August 14 and then failed to follow up on compliance. Again, that sort of failure presents no reasoned or deliberative choice among options of the sort warranting immunity. Had Sgt. Hollister chosen to advise Deputy Roberts in Spanish knowing that the officer spoke only English, no one would suggest he engaged in a protected discretionary function in making that choice. The failure actually implicated in the record might not be so stark, but it differs in degree rather than in kind.

The Kansas Supreme Court's recent decision in *Soto v. City of Bonner Springs*, 291 Kan. 73, 238 P.3d 278 (2010), does not re-

quire a different conclusion. In that case, Soto sued for false imprisonment when law enforcement officers detained him for several days on an arrest warrant issued for someone else with a nearly identical name. Soto alleged the officers were negligent in their efforts to confirm he was not the wanted man. The Supreme Court found the discretionary function immunity protected the officers. No statutes imposed specific obligations on law enforcement officers holding an arrestee to confirm a claim of mistaken identity. And the particular governmental entities maintained no detailed, mandatory policies outlining actions to be taken in that situation. The officers took steps to ascertain whether they had the right person in custody. Although Soto may have thought those efforts to be lacking, the officers' determination on how best to proceed reflected protected discretionary decisionmaking in selecting among myriad reasonable methods and options for confirming they had detained the wanted man and not an unfortunate name-alike. The facts here do not portray the same kind of selection among reasonable alternatives.

In addition, the discretionary function exception is legally inapplicable to the circumstances of this case. As we have already indicated, K.S.A. 75-6104(d) supplies the appropriate tort claim immunity here, at least as to the jail policies and procedures directly at issue. Those policies—regulating the monitoring of inmates in distress and prohibiting inmates from obscuring the windows in their cells—pertain to the health and safety of those confined in the jail. In turn, K.S.A. 75-6104(d) affords immunity to government entities based on the adoption and enforcement of health and safety policies *only if* the entities owe no independent duty to the persons protected. As the Kansas courts recognize, governmental bodies maintaining penal facilities owe a freestanding duty to the inmates to act reasonably to provide a safe environment. Accordingly, Brown County secures no refuge in K.S.A. 75-6104(d).

Moreover, K.S.A. 75-6104(d), as a statutory provision specifically addressing health and safety policies, applies to the exclusion of the more general discretionary function immunity. Typically, of course, a specific statutory enactment controls over a more general one operating in the same sphere. *In re K.M.H.*, 285 Kan. 53, 82,

169 P.3d 1025 (2007). There is no reason to jettison that preference here. The legislative history of the immunity granted in K.S.A. 75-6104(d) redoubles that conclusion. As outlined in *Jarboe*, 262 Kan. at 626-28, the legislature enacted that subsection to negate a judicial interpretation of the discretionary function exception rendered in *Fudge v. City of Kansas City*, 239 Kan. 369, 720 P.2d 1093 (1986), prohibiting immunity when government actors deviate from internal policies and procedures in dealing with individuals owed no legally enforceable duty apart from one created through those policies and procedures. In other words, *Fudge* recognized that detailed, mandatory governmental policies and procedures could create a legal duty where none otherwise existed and breach of that duty would not be immunized under the KTCA. The legislative response to *Fudge* was a resounding rejection of that interpretation of the KTCA, captured in the passage of K.S.A. 75-6104(d). That section, then, reflects a particularized application of the discretionary function exception, and where it applies, it does so to the exclusion of the more general exception.

As to the Brown County jail policies and procedures at issue, K.S.A. 75-6104(d) controls and would not extend immunity to Defendants.

*Brown County's Vicarious Liability*

In the district court, Brown County argued that it should not be held vicariously liable for any negligence of Sheriff Shoemaker or his department's employees based on a statute of limitations defense. The County submits Plaintiffs did not include a specific assertion of vicarious liability in their federal court complaint. Plaintiffs first expressly mentioned vicarious liability, using that term, in their petition filed after dismissal of the federal case and long after the events surrounding Belden's death. We address the point because we have determined there is evidence from which a jury might impose liability on either Deputy Roberts or Sgt. Hollister.

Under the KTCA, Brown County would be liable for the negligent conduct of the Sheriff's Department employees acting within the scope of their work and not otherwise immunized. In *Cansler v. State*, 234 Kan. 554, 567, 675 P.2d 57 (1984), the Kansas Su-

preme Court recognized that a county would bear legal liability for negligent actions of sheriff's department employees performing a duty the department had undertaken. The provisions of KTCA conform to that determination. As we have pointed out, the KTCA mandates that a governmental entity shall be liable for the wrongful conduct of its employees. Under the KTCA, a "government entity" entails the "state or [a] municipality." K.S.A. 75-6102(c). In turn, a "municipality" includes "any county" but sheriffs' departments are not separately listed in the definition. K.S.A. 75-6102(b). Sheriffs' departments are embraced within the term "municipality." Thus, for purposes of the KTCA, sheriff's department personnel are employees of the county. The federal courts in Kansas have concluded sheriffs and their supporting staff are county employees. *Woodson*, 801 F. Supp. at 468-69; *Eames v. Board of County Com'rs*, 733 F. Supp. 322, 324 (D. Kan. 1990) (sheriff and deputies "are employees of the county they serve").

All of the state law claims arising from Belden's death are governed by the 2-year statute of limitations in K.S.A. 60-513. Plaintiffs had knowledge of the nature and scope of those claims when they filed their federal complaint in 2004. They filed their petition in this case almost 4 years later. For purposes of addressing the vicarious liability of Brown County, we presume the petition to have been filed after the claims accrued and the 2-year limitations period had run.

We discount Plaintiffs' argument that the vicarious liability allegations asserted in the petition "relate back" to the filing of the federal suit and, therefore, should be considered timely for that reason. Under K.S.A. 60-215(c)(1), an amendment to a petition asserting new claims or grounds for relief against a defendant relates back to the date of the original filing. If a petition has been filed within the statute of limitations for the claims to be added by amendment, the new claims are treated as timely. But K.S.A. 60-215 does not apply here. It pertains to amendments to pleadings in a pending suit. If Plaintiffs had amended their petition in this case to add a claim against one of the defendants, the claim would be treated as if it had been raised in the original petition. But the relation back aspects of K.S.A. 60-215 have nothing to do with an

earlier suit—such as the federal complaint—that has been dismissed. In short, K.S.A. 60-215 does not provide a bridge allowing an amendment filed in one case to be considered part of an earlier suit.

Nonetheless, Brown County fails on its statute of limitations argument because Plaintiffs' federal complaint provided sufficient notice to the County that it faced vicarious liability for the alleged negligence of various Sheriff's Department employees. The federal complaint was filed before the statute of limitations expired and, thus, preserved that theory. Following dismissal of the complaint, Plaintiffs filed their petition in this case within the 30-day window created by 28 U.S.C. § 1367(d) permitting a party to reassert state law claims dismissed for lack of jurisdiction in federal court without facing a statute of limitations bar. Accordingly, any theories of state law liability fairly within the notice provided to Brown County in the federal complaint should be treated as timely for limitations purposes.

Under Fed. R. Civ. P. 8, a complaint need only contain "a short and plain statement of the claim showing the pleader is entitled to relief." See *Vincent v. City Colleges of Chicago*, 485 F.3d 919, 923 (7th Cir. 2007). The content should give the defendant "fair notice" of the claims, typically by identifying the circumstances and events to be litigated. *Aktieselskabet AF 21.November 2001 v. Fame Jeans*, 525 F.3d 8, 15-16 (D.C. Cir. 2008). But a sufficient, if minimal, complaint requires neither recitation of specific facts nor identification of precise legal theories. *Vincent*, 485 F.3d at 923.

Plaintiffs' complaint identified by name or description the Sheriff's Department employees and the county commissioners and outlined alleged deficiencies in their actions in dealing with Belden and in operating the jail. The allegations also indicated all of the individuals acted within the scope of their work or the purview of their elected offices. The complaint sought to impose liability on the individual defendants and Brown County, but it did not use the terms "respondeat superior" or "vicarious liability" to identify one of the legal bases for doing so. Federal courts have consistently recognized allegations of that sort in a complaint—identifying alleged acts of negligence or other wrongful conduct on the part of

employees performing their jobs—give fair notice to the employer that it may be subject to vicarious liability. *Rebstock v. Evans Productions Engineering Co., Inc.*, No. 4:08CV01348 ERW, 2009 WL 3401262, *11 (E.D. Mo. 2009) (unpublished opinion) (Plaintiff's allegations of negligent acts by defendant's employees were sufficient to put defendant on notice of respondeat superior liability even though the complaint fails to use that phrase, vicarious liability, or similar terminology.); *George v. Morton*, No. 2:06-CV-1112-PMP-GWF, 2007 WL 680788, *13 (D. Nev. 2007) (unpublished opinion) ("[U]nder the ordinary notice pleading standard, Plaintiff has stated a claim against HRSM because Plaintiff alleged HRSM's officers conducted business without all required licenses thereby putting HRSM on notice of its potential vicarious liability."); *Isik Jewelry v. Mars Media, Inc.*, 418 F. Supp. 2d 112, 130 (E.D. N.Y. 2005); *Del Amora v. Metro Ford Sales and Service, Inc.*, 206 F. Supp. 2d 947, 949-50 (N.D. Ill. 2002) (A complaint alleging wrongdoing by a nonsupervisory employee of defendant and defendant's violation of federal credit reporting statutes "encompass[ed] the possibility of a theory of vicarious liability," thereby giving sufficient notice under Fed. R. Civ. P. 8.).

Federal law guides the determination of the sufficiency of the notice imparted to Brown County in Plaintiffs' complaint. Given that authority, we conclude that Brown County had adequate and timely notice in the complaint that it could face liability for the alleged wrongful conduct of the other defendants. Accordingly, its statute of limitations defense to liability based on vicarious liability fails. The Kansas Supreme Court has taken a view comparable to that expressed in the federal courts regarding the sufficiency of pleadings in imparting notice of vicarious liability to employers. *Beggerly v. Walker*, 194 Kan. 61, 65-66, 397 P.2d 395 (1964) (Allegations implying an employee acted within the scope of his employment at a private club when he hit plaintiff, a patron at the club, provided sufficient notice to the employer that it faced respondeat superior liability.). While *Beggerly* was decided under the old procedural rules, we have little doubt the outcome would be the same under the present Kansas Code of Civil Procedure, which is closely modeled on the federal rules.

Our conclusion is further bolstered by the KTCA. Liability of a governmental entity for the negligent acts of its employees arises by operation of law under the KTCA rather than from any formal allegation of such liability in the petition. Under K.S.A. 75-6103, "each governmental entity shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment . . . ." And under K.S.A. 75-6109, "a governmental entity is liable, and shall indemnify its employees against damages, for injury or damage proximately caused by an act or omission of an employee while acting within the scope of his or her employment." Those provisions statutorily impose liability on a governmental entity subject to the KTCA for employee negligence. That would be true regardless of whether a plaintiff has even named the government body as a defendant, let alone expressly pled vicarious liability.

Brown County alleges neither undue surprise nor prejudice resulting from Plaintiffs' assertion of vicarious liability. The County does not suggest it would have defended against the federal claims or the state claims in some other way had Plaintiffs been excruciatingly clear in alleging vicarious liability. Even if the complaint were insufficiently exact, Brown County shouldn't have been deterred in fully defending against the claims because, as we have said, it knew it would be legally liable under the KTCA for any judgment against individual Sheriff's Department employees for conduct arising from their employment. And that liability would attach regardless of how Plaintiffs pled their case against the County.

*Deputy Roberts' Statute of Limitations Defense*

In the summary judgment papers, Deputy Roberts argued that he had a statute of limitations defense because he was not identified by name as a defendant in the federal complaint but merely through the pseudonym "John Doe," described as an "unidentified employee[] of Brown County. . . responsible for guarding and supervising Jeffrey Ray Belden on the day of his death." Deputy Roberts was not formally identified as a defendant until well into the federal litigation and well after the limitations period had ex-

pired. Deputy Roberts says that entitles him to assert that defense in this suit. Plaintiffs countered that the federal court reviewed and rejected his statute of limitations argument.

Deputy Roberts did raise his limitations defense in federal court, and it was denied. The federal district court ruled that he had not timely asserted the defense after he had been added as a named defendant. The court found Deputy Roberts, therefore, waived the defense. We need not detail the procedural gymnastics in federal court resulting in that determination given our resolution of the issue here. Likewise, we do not venture into the efficacy of naming pseudonymous defendants in federal suits as surrogates for unknown individuals. We presume the practice to be ineffective to avoid a limitations bar. See *Garrett v. Fleming*, 362 F.3d 692, 696-97 (10th Cir. 2004) (holding that naming a "John Doe" defendant in a complaint fails to preserve a claim against a statute of limitations bar and collecting cases on the point).

Given the Kansas Supreme Court's formulation of res judicata or claim preclusion in *Stanfield* and *Rhoten*, Deputy Roberts cannot raise an affirmative defense based on the statute of limitations precisely because he could have and did assert it in the now dismissed federal suit. As we have discussed, *Rhoten* applies res judicata to bar relitigation of state claims filed in federal court and then dismissed for lack of jurisdiction in that forum. Just as *Rhoten* presumed to apply federal res judicata principles, we must do likewise—filtered through the prism of that Kansas Supreme Court precedent—to determine the impact on Deputy Roberts' defense. See *Rhoten*, 290 Kan. at 106.

Res judicata, as applied in federal courts, precludes relitigation of every matter related to a cause of action, including particular theories of liability and particular defenses to those theories. The United States Supreme Court has repeatedly stated res judicata binds the " ' "parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose." ' " *Travelers Indemnity Co. v. Bailey*, 557 U.S. 137, 152, 129 S. Ct. 2195, 174 L. Ed. 2d 99 (2009) (quoting *Nevada v. United States*, 463 U.S. 110, 130,

103 S. Ct. 2906, 77 L. Ed. 2d 509 [1983]) (quoting *Cromwell v. County of Sac*, 94 U.S. 351, 352, 24 L. Ed. 195 [1877]). A leading treatise cites that formulation of the rule of res judicata as "a typical example." 18 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 4406, p. 140 (2002). Federal appellate courts regularly rely on that statement of the doctrine. See, *e.g.*, *Czarniecki v. City of Chicago*, 633 F.3d 545, 550 (7th Cir. 2011); *Wintermute v. Kansas Bankers Sur. Co.*, 630 F.3d 1063, 1067-68 (8th Cir. 2011). The Supreme Court has offered similarly broad descriptions of the reach of res judicata in other cases. *Allen v. McCurry*, 449 U.S. 90, 94, 101 S. Ct. 411, 66 L. Ed. 2d 308 (1980) ("[R]es judicata . . . precludes the parties or their privies from relitigating issues that were or could have been raised in that action.") (citing *Cromwell*, 94 U.S. at 352).

Federal courts, then, construe res judicata to preclude a defendant from raising a defense that had been or was asserted in an earlier case between the same parties arising out of the same cause of action. This is sometimes called defense preclusion. See 18A Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 4442 (2002). As the Kansas Supreme Court has defined claims or causes of action and judgments on the merits for res judicata purposes in *Stanfield* and *Rhoten*, Deputy Roberts may not present a statute of limitations defense in this case because he presented that same defense in response to the same claims in the federal court action where a judgment on the merits has been entered, albeit only on the federal claims. While Deputy Roberts undoubtedly disagrees with the federal court's rejection of his defense, that is irrelevant to a res judicata bar in this case. *Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S. Ct. 2424, 69 L. Ed. 2d 103 (1981) ("Nor are the res judicata consequences . . . altered by the fact that the judgment may have been wrong or rested on a legal principle subsequently overruled in another case.") (Cases cited.).

In response to Defendants' summary judgment motion in this case, Plaintiffs pointed to the determination of Deputy Roberts' limitations defense in federal court as prohibiting it here. Unlike a defendant, a plaintiff has no obligation to assert the defense pre-

clusion component of res judicata during the pleading stage of a civil suit. A defendant must identify res judicata as an affirmative defense in an answer as provided in K.S.A. 60-208(c). This case illustrates why there is no equivalent obligation for a plaintiff asserting defense preclusion to raise that theory at the pleading stage.

Here, Deputy Roberts asserted his statute of limitations defense in his answer—it, too, is an affirmative defense that must be pled. But a plaintiff is not required to file a pleading in response to affirmative defenses in an answer. K.S.A. 60-207(a). Indeed, no such pleading is allowed. Accordingly, a plaintiff may raise defense preclusion at such time in the litigation as the defendant seeks a court ruling on an affirmative defense.

Plaintiffs in this case likewise are not barred by judicial estoppel from invoking defense preclusion. They did not ask the federal court to dismiss their state law claims so those claims could be pursued in Brown County District Court. Defendants did, and their request triggered an estoppel applicable to them. Plaintiffs, however, consistently and adamantly resisted dismissal of their state law claims in federal court. Their assertions do not now preclude them from relying on the defense preclusion aspects of res judicata.

Under Kansas res judicata principles, Deputy Roberts may not assert a statute of limitations defense in this case.

## CONCLUSION

The district court's entry of summary judgment for Defendants is affirmed in part and reversed in part. The case is remanded for further proceedings consistent with this opinion.